UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ------------------------------------------------------------x <br><br> IN RE: <br><br> VARGAS REALTY ENTERPRISES, INC., ET AL., <br><br>    DEBTORS. <br><br><br> ------------------------------------------------------------x | CHAPTER 11 <br><br> CASE NO. 09-10402 (SMB) <br> JOINTLY ADMINISTERED <br><br> STUART M. BERNSTEIN <br> UNITED STATES BANKRUPTCY <br> JUDGE |

**FOURTH AMENDED DISCLOSURE STATEMENT FOR CONSOLIDATED PLAN OF LIQUIDATION OF VARGAS REALTY ENTERPRISES, INC., NOBLE REALTY CORP., E.R. PROPERTIES, INC. AND V&R REALTY CORP. AS PROPOSED BY CFA W. 111 STREET, L.L.C.**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT**

**IMPORTANT: THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION WITH REGARD TO THE PROPONENT'S PLAN**

**PLEASE READ THIS DOCUMENT WITH CARE**

DATED:     NEW YORK, NEW YORK
           OCTOBER 1, 2009

                         KRISS & FEUERSTEIN LLP
                         ATTORNEYS FOR SECURED CREDITOR AND
                         PROPONENT, CFA W 111 STREET, L.L.C.
                         360 LEXINGTON AVENUE, SUITE 1200
                         NEW YORK, NEW YORK 10017
                         (212) 661-2900

# PLAN SUMMARY

The following summary is qualified in its entirety by the more detailed information appearing later in this Fourth Amended Disclosure Statement ("Disclosure Statement" or "Fourth Amended Disclosure Statement").

This Fourth Amended Plan of Liquidation (the "Fourth Amended Plan" or "CFA Plan") dated August 28, 2009, is proposed by secured creditor, CFA W 111 STREET, L.L.C. (the "Proponent" or "CFA") on behalf of the jointly administrated Debtors herein, Vargas Realty Enterprises, Inc., Noble Realty Corp., E.R. Properties, Inc. and V & R Realty Corp. ("Debtors") and has been filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Fourth Amended Plan is a liquidation plan which proposes to sell substantially all of the assets of the jointly administered (and proposed substantially consolidated) Debtors-in-Possession, free and clear of all liens and encumbrances, at a public auction (the "Public Auction Sale") to be conducted by the Liquidation Trustee no later than 60 days following the Confirmation of the Fourth Amended Plan. Proponent has agreed to serve as the stalking horse bidder in connection with the Public Auction Sale and will interpose an offer to acquire the Debtors' properties by credit bidding the sum of $10,000,000.00 ("CFA Credit Bid"), which is an amount less than the CFA Secured Claim. As discussed herein, CFA will release its lien on the Cash Collateral and waive any deficiency claim against the Debtors (but not with respect to any guarantors under the CFA Loan), which shall be used to pay Creditors' Claims.

As is set forth in detail in this Fourth Amended Disclosure Statement, the Debtors have failed to propose a feasible Plan of Reorganization. As a result, Proponent has come to the realization that the liquidation of the Debtors' assets, primarily consisting of four residential apartment buildings located on W. 111th Street, in the Harlem section of Manhattan, as contemplated in the Fourth Amended Plan is the best alternative to simply allowing the Debtors' secured creditors to foreclose their interests. Accordingly, in CFA's opinion, the treatment of Claims and Interests under the Fourth Amended Plan provides for a greater recovery for Creditors than that which would be likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors.

**This Fourth Amended Disclosure Statement is provided to each creditor entitled to vote on the Fourth Amended Plan. Under the Bankruptcy Code your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation of acceptances of the Plan. In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose Claim is duly scheduled by the Debtors as undisputed, non-contingent and liquidated, or who, prior to the Confirmation Hearing, has filed with the Bankruptcy Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtors' Schedules, which are on file at the office of the Clerk of the Bankruptcy Court.**

**Since Proponent believes that Confirmation of the Plan will result in greater recoveries for unsecured creditors, the Proponent believes confirmation of the Plan is in the best interests of Creditors and Interest Holders and urges that they vote to ACCEPT the Plan.**

The Bankruptcy Court has not yet confirmed the Fourth Amended Plan described in this Disclosure Statement and therefore the terms of the Fourth Amended Plan are not yet binding on anyone. However if the Bankruptcy Court later confirms the Fourth Amended Plan, then the Fourth Amended Plan will be binding on the Debtors and on all Creditors and Interest Holders in this case, regardless of whether any individual Creditor or Interest Holder votes to accept the Fourth Amended Plan.

The Bankruptcy Court will hold a hearing (the "Confirmation Hearing") on confirmation of the Fourth Amended Plan at which time the Bankruptcy Court will consider objections to confirmation, if any, at _____ A.M. on _____, 2009 in the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York. The Confirmation Hearing may be adjourned from time to time without notice other than the announcement of an adjourned date at the Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Fourth Amended Plan be filed and served as described herein in the Section captioned "CONFIRMATION OF THE PLAN" on or before _____ 2009 at 4:00 p.m. EST.

A copy of the Fourth Amended Plan accompanies this Disclosure Statement. All capitalized terms contained in this Disclosure Statement shall, unless otherwise defined herein, have the meaning ascribed to such capitalized terms in Section I of the Fourth Amended Plan captioned, "Definitions."

## THE DEBTORS

Each of the jointly administered Debtors herein is the owner of a parcel of real property improved by a residential apartment building. On January 29, 2009, each of the jointly administered Debtors filed a separate petition[1] (the "Petitions") pursuant to Chapter 11 of the Bankruptcy Code (the "Petition Date"), upon information and belief, to prevent a Receiver from taking control of Debtors' Properties. The Receiver was appointed in connection with a foreclosure action commenced by Proponent to foreclose a Mortgage, Assignment of Leases and Rents and Security Agreement ("CFA Mortgage") held by CFA dated August 28, 2007, in the principal sum of EIGHT MILLION AND 00/100 ($8,000,000.00) DOLLARS (the "CFA Loan").

On June 9, 2009, it was determined by the Bankruptcy Court that Debtors' Properties[2] each met the definition of "single asset real estate" as defined by 11 U.S.C.§101(51B). The Debtors operate their business as a debtor in possession pursuant to section 1107(a) and 1108 of the

---

[1] 09-10403-smb Noble Realty Corp, 09-10406-smb V & R Realty Corp., 09-10407-smb E.R. Properties, Inc.

[2] The Debtors' properties are: 136 West 111th Street, New York, New York (Block: 1820 Lot: 51); 144 West 111th Street, New York, New York (Block: 1820 Lot: 54); 148 West 111th Street, New York, New York (Block: 1820 Lot: 57); and 140 West 111th Street, New York, New York (Block: 1820 Lot: 53)(the "Properties").

Bankruptcy Code.

According to the Debtors' schedules, the Debtors' sole source of income is generated from renting the residential apartments located on the Properties. Based on the Debtors' representations set forth in the publically filed documents in connection with this matter, the Debtors' business operations are run by their purported sole shareholder, Victor Vargas. According to the Debtors, the businesses are interconnected presently, and historically, through financial or financing transactions secured and cross-collateralized by each of the four real properties each owned by one of the four Debtors. In light of the fact that the Debtors do not appear to have segregated their finances prior to the Bankruptcy, the Proponent seeks to substantively consolidate the Debtors' bankruptcy cases. Proponent's application to substantively consolidate the Debtors' estates is discussed in greater detail in the Section entitled "Substantive Consolidation" set forth below.

Proponent's Loan is further secured by an Assignment of Leases and Rents. Therefore, all rents collected from tenants at the Properties is cash collateral ("CFA Cash Collateral") for the Loan pursuant to 11 U.S.C. §363 of the United States Bankruptcy Code. According to the Debtors' Operating Reports, as of August 31, 2009, the following amounts held by the respective Debtors in the Debtors' debtor-in-possession account with JP Morgan Chase Bank (the "DIP Accounts") is believed to be the Debtors' rental income, and thus CFA Cash Collateral:

| E.R. Properties, Inc. | $12,031.00 |
| V&R Realty Corp. | $21,430.00 |
| Noble Realty Corp. | $9,768.00 |
| Vargas Realty Enterprises, Inc. | $447,840.00 |
| Total CFA Cash Collateral | $491,069.00 |

Upon information and belief, the Debtors have utilized CFA Cash Collateral during the pendency of this case to pay expenses of the Properties and insiders of the Debtors, without the approval of the United States Bankruptcy Court.

The Debtors' Properties are encumbered principally by a first mortgage held by Proponent and a second mortgage in favor of Pensco Trust Co. f/b/o Joseph Porto IRA P01BW ("Pensco"). The Proponent believes that Pensco's claim is entirely unsecured because the value of the Properties is less than the amount of the CFA Secured Claim (as defined hereafter). Accordingly, the Plan treats the Pensco claim as totally unsecured.

According to the Debtors' Schedules and amendments thereto, the Debtors have disputed virtually every Claim. Thus, as evidenced by the Debtors' Chapter 11 Plans filed on May 31, 2009 (the "Debtors' Plan") and August 31, 2009 ("Debtors' Amended Plan"), the Debtors intend to reorganize by attempting to avoid almost every Claim. According to the Debtors' Revised Plan, on the later of 120 days following the Effective Date or the resolution of the appeal of the dismissal of the Adversary Proceeding, the Creditors will be repaid with new financing secured by the Debtors in the maximum amount of $7,500,000.00 and a cash contribution in the amount of $200,000.00 by Victor Vargas, who intends to retain his equity.

4

If the Debtors can not secure the required financing within 120 day period following the Effective Date or the resolution of the appeal, the Debtors wish to revert to CFA's original Plan of liquidation. However, since a year may elapse before the appeal is resolved, the Debtors' do not take into account that CFA will not be willing to make its stalking horse bid for the Properties at that time. Thus, the Debtors' Revised Plan is completely contingent upon the Debtors' succeeding on their frivolous appeal of the order dismissing the Adversary Proceeding seeking to invalidate CFA's Claim. The Debtors' Plan, which does not contemplate an immediate sale of the Properties, will not benefit anyone other than Victor Vargas, a statutory insider.

In furtherance of their purported attempt to reorganize, the Debtors filed eight separate Adversary Proceedings[3]. Four of the Adversary Proceedings (09-01251-09-01254), which sought to declare Proponent's Mortgage invalid, were dismissed on or about August 3, 2009. The Debtors have appealed this decision (the "Appeal"). On September 26, 2009, up[on information and belief, the Debtors dismissed the remaining four Adversary Proceedings (09-01247-09-01250), which seek to avoid both CFA's Mortgage and Pensco's second mortgage.

## THE PROPERTIES

The Debtors own certain real property as set forth below (collectively, the "Properties"):

(a)     Debtor, E.R. Properties, Inc. ("E.R.") is the owner of property located at 136 West 111th Street, New York, New York (Block: 1820 Lot: 51);

(b)     Debtor, V&R Realty Corp. ("V&R") is the owner of property located at 144 West 111th Street, New York, New York (Block: 1820 Lot: 54);

(c)     Debtor, Noble Realty Corp. ("Noble") is the owner of property located at 148 West 111th Street, New York, New York (Block: 1820 Lot: 57)[4]; and

(d)     Debtor, Vargas Realty Enterprises, Inc. ("Vargas Inc.") is the owner of property located at 140 West 111th Street, New York, New York (Block: 1820 Lot: 53).

The total number of rental units for the four Properties is 60, broken down as follows: Vargas Inc. – 10; V&R – 10; Noble – 20; and E.R. – 20. During the Bankruptcy the Debtors have allocated common expenses based on the number of rental units, so that expenses are allocated 33% as to Noble, 33% as to ERPI, 16.67% as to VREI, and 16.67% as to V&RRC. As admitted by Debtors in their public filings in this case, the Debtors' business operations are otherwise extensively comingled

---

[3] Vargas Realty Enterprises, Inc. v. Pensco Trust Company f/b/o/ Joseph Porto IRA PO1BW and CFA W. 111 Street, L.L.C., 09-01247; Noble Realty Corp. v. Pensco Trust Company f/b/o/ Joseph Porto IRA PO1BW and CFA W. 111 Street, L.L.C., 09-01248; V&R Realty Corp. v. Pensco Trust Company f/b/o/ Joseph Porto IRA PO1BW and CFA W. 111 Street, L.L.C., 09-01249; E.R. Properties, Inc. v. Pensco Trust Company f/b/o/ Joseph Porto IRA PO1BW and CFA W. 111 Street, L.L.C., 09-01250; Vargas Realty Enterprises, Inc. v. CFA W. 111 Street, L.L.C., 09-01251; Noble Realty Corp. v. CFA W. 111 Street, L.L.C., 09-01252; V&R Realty Corp. v. CFA W. 111 Street, L.L.C., 09-01253; ; V&R Realty Corp. v. Pensco Trust Company f/b/o/ Joseph Porto IRA PO1BW and CFA W. 111 Street, L.L.C., 09-01254.

[4] The Schedule A for this Debtor appears to contain a typographical error in that it states that Noble is the owner of the property located at 140 W. 111th Street, which is inconsistent with the information set forth on the Voluntary Petition.

and were not segreg ted prior to the Petition Date.

Proponent secured an Appraisal of the Properties from Originator's Resource Group[5] dated March 19, 2009 reflected an estimated value of each of the Properties as follows:

|     |                          |                |
|-----|--------------------------|----------------|
| (a) | 136-138 West 111th Street: | $2,900,000.00 |
| (b) | 140-142 West 111th Street: | $3,100,000.00 |
| (c) | 144 West 111th Street:     | $2,100,000.00 |
| (d) | 148 West 111th Street:     | $2,500,000.00 |

**TOTAL VALUE:          $10,600,000.00**

## THE PROPERTY DEBT

### The CFA Debt

On August 28, 2007, the Debtors made, executed and delivered a Consolidated Secured Promissory Note in the principal sum of EIGHT MILLION AND 00/100 ($8,000,000.00) DOLLARS in favor of CFA (the "CFA Note", together with the CFA Mortgage, CFA ALR, and such other documents entered into in connection with the CFA Loan, being the "CFA Security Documents"). To secure repayment of the indebtedness evidenced by the CFA Note, on August 28, 2007, the Debtors executed and delivered the CFA Mortgage. The CFA Mortgage is a first lien against the Properties and was recorded in the Office of the City Register of New York, County of New York on September 14, 2007 as CRFN No.: 2007000473975. As additional security for the CFA Note, the Debtors executed an Assignment of Leases and Rents (the "CFA ALR") which was recorded in the Office of the City Register of the City of New York on September 14, 2007 as CRFN No.: 2007000473977. Pursuant to the ALR, the Debtors pledged the rental income generated at the Properties to CFA.

Pursuant to Paragraph 2 of the CFA Note, interest shall accrue on the unpaid principal balance a rate equal to the greater of: (i) 12.25% or (ii) 400 basis points above the Prime Rate as published in the Wall Street Journal, adjustable monthly. Pursuant to Paragraph 4.4 of the Note, captioned, Default Rate and Late Charges, interest accrues on the unpaid principal sum at the rate of 24% per annum upon the earlier of: (i) the Maturity Date which is September 1, 2008 or (ii) an event of default as defined in the CFA Note and CFA Mortgage. The Debtors defaulted under the CFA Note and CFA Mortgage by, among other things, failing to tender the monthly payment which came due on April 1, 2008 in the amount of $89,834.35 and have failed to tender all subsequent payments that were due and owing to CFA thereafter (the "Default"). Notwithstanding the Default, the CFA Loan matured on September 1, 2008 and Debtors failed to pay the entire balance due and owing

---

[5] The Appraisal is too voluminous to attach to this motion, but a copy will be provided upon request to Kriss & Feuerstein, 360 Lexinton Avenue Suite 1200, New York, New York 10017 (212) 661-2900) Attn: Jerold Feuerstein, Esq..

6

under the CFA Note and CFA Mortgage on such maturity date.

As a result of the Default, CFA commenced a foreclosure action in the Supreme Court of the State of New York, New York County on or about July 22, 2008, Index No.: 110017/2008 (the "Foreclosure Action"). Due to a dispute over the ownership of the Debtors between Victor Vargas and his son Henry Vargas, the Debtors interposed two separate Answers by separate counsel, one retained by Victor Vargas (Carl Person, Esq.) and one retained by Henry Vargas (Mitchell Cantor, Esq.). On or about December 9, 2008, Henry Vargas and Victor Vargas both signed a Pre-Negotiation Letter waiving all defenses to the Foreclosure Action on behalf of the Debtors (the "Pre-Negotiation Letter"). On January 27, 2009, Paul Sklar, Esq. (the "Receiver"), was appointed in the Foreclosure Action as temporary receiver for the Properties (the "Receiver Order"). The Receiver did not take control over the Properties due to the filing of the Debtors' Petitions.

The approximate amount of the CFA Secured Claim, as of September 29, 2009, is $11,233,306.46, which is more fully set forth in the following chart:

| Principal | 8,000,000.00 |
| Note Rate (12.25%) | 1,590,978.69 |
| Default Rate Interest (24%-12.25%) | 1,428,277.78 |
| Late Fees as of Petition Date | 74,049.99 |
| Attorney's Fees | 60,000.00 |
| Exit Fee | 80,000.00 |
| Total CFA Secured Claim | $11,233,306.46 |

Interest at the Default Rate continues to accrue on the CFA Loan at the per diem rate of $5,333.33.

The Pensco Debt

Upon information and belief, on or about December 7, 2007, the Debtors executed a promissory note in the amount of $225,000 in favor of Pensco, secured by a second mortgage on the respective real properties of the four Debtors herein as security for a loan in the amount of $225,000 (the "Pensco Note", "Pensco Mortgage" and "Pensco Loan", respectively). The Pensco Mortgage is a second mortgage encumbering the Properties.

On April 24, 2009, Pensco filed a Proof of Claim asserting a secured claim in the amount of $279,840.68. On or about May 25, 2009, the Debtors commenced four Adversary Proceedings against Pensco seeking to declare the Pensco Mortgage invalid and unenforceable. Upon information and belief, the Adversary Proceedings were dismissed by the Debtors with prejudice on September 26, 2009.

Based on the value of the Collateral, CFA is an undersecured creditor with priority over Pensco's secured interest in the same collateral. Thus, Pensco's Loan is properly treated as an

unsecured debt pursuant to the Bankruptcy Code.

## THE PLAN PROPONENT

Proponent is a secured creditor of the Debtors by virtue of the CFA Security Documents and CFA holds a first lien encumbering the Properties in the original principal sum of $8,000,000.00.

Since the Petition Date, CFA has received no post-petition adequate protection payments. On April 7, 2009, Proponent filed a motion for relief from the automatic stay pursuant to 11 U.S.C. 362(d)(1) and (2) and alternatively for a determination that the Debtors were each Single Asset Real Estate Entities as defined by 11 U.S.C. 1121(51). The Court heard the Proponent's motion on June 9, 2009 and scheduled an evidentiary hearing with respect to the branch of the motion seeking relief from the stay (or alternatively, adequate protection), and ruled from the bench that each debtor's real property qualified as "single asset real estate." A hearing on CFA's motion for relief from stay has been adjourned, *sine die*. As a result of the "single asset real estate" determination, pursuant to 11 U.S.C. 362(3), CFA is now entitled to relief from stay because the Debtors failed to remit adequate protection payments thirty days after this designation.

On or about May 25, 2009, each Debtor filed two Adversary Complaints against Proponent seeking to declare CFA's Note and Mortgage invalid and unenforceable. The Debtors subsequently amended their Adversary Complaints to include a cause of action to set aside the Pre-Negotiation Letter as a fraudulent conveyance and/or a preference as well as other causes of action. The Adversary Proceedings against CFA were dismissed by Order of the Bankruptcy Court on or about August 3, 2009 (the "Dismissal Order"). The Debtors have appealed the Dismissal Order which is pending in the United States District Court under, Case Number: 09-08136 and has been assigned to Judge Richard J. Sullivan (the "Appeal").

CFA intended to move for summary judgment in the four remaining Adversary Proceedings in which both Pensco and CFA are named as defendants. However, on or about September 29, 2009 the Debtors agreed to voluntarily dismiss these Adversary Proceedings against CFA with prejudice and CFA's counsel has executed a Stipulation to this effect.

Pursuant to 11 U.S.C. Section 1121(b), only the Debtor may file a plan until after 120 days after the Petition Date. If the Debtor files a Plan within this 120 day period, no other party in interest may file a Plan unless the Debtors' Plan has not been accepted within 180 days of the Petition Date. This is known as the "exclusivity period". The Petition Date is January 29, 2009. The Debtors' Plan, which was not accompanied by a Disclosure Statement, was filed on May 29, 2009. The 180 day exclusivity period expired on July 28, 2009 and the Debtors' Plan was not accepted. As such, CFA is entitled to propose this Fourth Amended Plan on behalf of the Debtors.

On August 31, 2009, the Debtors' filed a First Amended Plan and Disclosure Statement. CFA has filed objections to the Debtors' First Amended Plan as has the United States Trustee.

## DECISION TO COMMENCE THIS CASE

It has been alleged by the Debtors that the reason for the commencement of this case was the pending motion for summary judgment in Proponent's foreclosure action along with the appointment of a Receiver over the Properties. Debtors further allege that Henry Vargas incurred substantial unauthorized debts on behalf of the Debtors which they intend to avoid in this Bankruptcy Case.

## SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

### RETENTION OF PROFESSIONALS

Section 327(a) of the Bankruptcy Code provides that the Debtor, with the court's approval, may employ one or more accountants or other professional persons that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the Debtor in carrying out its duties under the Bankruptcy Code. 11 U.S.C. § 327(a).

On March 25, 2009, the Bankruptcy Court issued an Order authorizing the Debtors to retain Carl Person as its bankruptcy counsel. Additionally, pursuant to an Order dated March 25, 2009, the Debtors have retained Lebenhart Seckendorf Hasson and Reilly as accounts for the Debtors. As of the date hereof, no other professionals have been retained by the Debtors.

### SCHEDULES

A brief summary of the Debtors' Schedules and the Claims Register in each of the Debtors' cases is set forth below. As the Proponent has applied herein for the substantive consolidation of each of Debtors' estates, the below summary also includes a good faith estimate of the Debtors' Consolidated Schedules and Claims Register, taking into account possible duplicative claims against the Debtors' Consolidated Estate.

**A. INDIVIDUAL SCHEDULES AND CLAIMS REGISTERS FOR EACH DEBTOR**

## VARGAS INC. SCHEDULES

| VARGAS INC. | SCHEDULES | CLAIMS REGISTER |
|---|---|---|
| SCHEDULE A<br>Real Property<br>(140 W. 111th) | $2,000,000.00 (Appraisal conducted by Originator's Resource Group, dated March 19, 2009 shows an appraised value of $3,100,000.00) | N.A. |
| SCHEDULE B<br>Personal Property | <u>$12,500.00</u> (household, machinery, office equipment)<br>**Total: $12,500.00**<br><br>(debtor lists an "unknown" amount of cash deposited into the single account of Vargas Realty. Pursuant to the Debtor's Operating Report, dated August 31, 2009, Vargas Inc. holds approximately $447,840.00 in cash )<br><br>(While Debtors admit to having one office located at the Properties and having a combined $50,000.00 in personal property, Debtor has failed to reflect such amounts in an updated Schedule B. ¼ of the combined personal property, representing $12,500.00, will be allocated to each Debtor for the purposes of this schedule.) | N.A. |
| AMENDED SCHEDULE D<br>Secured Claims<br>(filed on 5/26/09) | $9,600,000.00 (CFA Loan)<br><u>$250,000.00</u> (Pensco Loan)<br>**Total: $9,850,000.00** | $9,725,376.27 (CFA Loan)<br><u>$279,840.68</u> (Pensco Loan[6])<br>**Total: $10,005,216.95** |
| SCHEDULE E<br>Unsecured Priority Claims | -0- | $4,511.03 (IRS)<br><u>$14.82</u> (NYS Taxation)<br>**Total: $4,525.85** |
| AMENDED SCHEDULE F[7]<br>Unsecured Non-Priority Claims<br>(filed on 3/11/09) | $500,000.00 (Crown Fncl.)<br>$38,250.00 (Fidelity)<br>$1,058.77 (ConEd)<br>$-0- (A.Lichenstein)<br>$75,000.00 (MediaMax) (disputed) – no POC<br>$17,000.00 (Approved Oil) (disputed) – no POC<br><u>$1,100.00</u> (Legal Services) (disputed) – no POC<br>**Total: $632,408.77** | $500,000.00 (Crown Fncl.)<br>$247,000.00 (A.Lichenstein[8])<br>$87,951.12 (Fidelity)<br>$2,831.05 (IRS)<br>$1,999.43 (ConEd)<br><u>$34.80</u> (NYS Taxation)<br>**Total: $839,816.40** |

---

[6] Pensco only filed a POC against Vargas Realty, however, the Pensco Loan was entered into with all 4 Debtors.

[7] Any creditor of any of the Debtors who did not file a POC where the amount owed such creditor is listed on such Debtors' schedule as $-0- or otherwise disputed is not included in the summary of Debtors' Schedules as such creditors have not adequately preserved their claim against the Debtors' estates.

[8] Creditor's POC references 4 separate bankruptcy cases, evidencing Creditor's intent to file a POC against each Debtor. However, Creditor's POC only "of record" against Debtor Vargas Realty.

# V&R SCHEDULES

| V&R | SCHEDULES | CLAIMS REGISTER |
|---|---|---|
| SCHEDULE A<br>Real Property<br>(144 W. 111th) | $3,000,000.00<br>(Appraisal conducted by Originator's Resource Group, dated March 19, 2009 shows an appraised value of $2,100,000.00) | N.A. |
| SCHEDULE B<br>Personal Property | <u>$12,500.00</u> (household, machinery, office equipment)<br>**Total: $12,500.00**<br>(debtor lists an "unknown" amount of cash deposited into the single account of Vargas Realty. Pursuant to the Debtor's Operating Report, dated August 31, 2009, V&R holds approximately $21,430.00 in cash)<br>(While Debtors admit to having one office located at the Properties and having a combined $50,000.00 in personal property, Debtor has failed to reflect such amounts in an updated Schedule B. ¼ of the combined personal property, representing $12,500.00, will be allocated to each Debtor for the purposes of this schedule.) | N.A. |
| AMENDED SCHEDULE D<br>Secured Claims<br>(filed 5/26/09) | $9,600,000.00 (CFA Loan)<br><u>$250,000.00</u> (Pensco Loan)<br>**Total: $9,850,000.00** | <u>$9,725,376.27</u> (CFA Loan)<br>**Total: $9,725,376.27**<br>(Pensco did not file a POC for this Debtor) |
| SCHEDULE E<br>Unsecured Priority Claims | -0- | <u>$1,650.00</u> (NYC Taxation)<br>**Total: $1,650.00** |
| SCHEDULE F<br>Unsecured Non-Priority Claims<br>(filed 3/11/09) | $38,250.00 (Fidelity) (disputed) – No POC<br><u>$75,000.00</u> (MediaMax) (disputed) – No POC<br>**Total: $113,250.00** | $500,000.00 (Crown Fncl.)<br><u>$-0-</u> (ConEd)<br>**Total: $500,000.00** |

# E.R. SCHEDULES

| E.R. | SCHEDULES | CLAIMS REGISTER |
|---|---|---|
| SCHEDULE A<br>Real Property<br>(136 W 111th) | "unknown" (Appraisal conducted by Originator's Resource Group, dated March 19, 2009, shows an appraised value of $2,900,000.00) | N.A. |
| SCHEDULE B<br>Personal Property | $12,500.00 (household, machinery, office equipment)<br>$230.00 (ConEd security deposit)<br>**Total: $12,730.00**<br>(debtor lists an "unknown" amount of cash deposited into the single account of Vargas Realty. Pursuant to the Debtor's Operating Report, dated August 31, 2009, E.R. holds approximately $12,031.00 in cash)<br>(While Debtors admit to having one office located at the Properties and having a combined $50,000.00 in personal property, Debtor has failed to reflect such amounts in an updated Schedule B. ¼ of the combined personal property, representing $12,500.00, will be allocated to each Debtor for the purposes of this schedule.) | N.A. |
| AMENDED SCHEDULE D<br>Secured Claims<br>(filed 5/26/09) | $9,600,000.00 (CFA Loan)<br>$250,000.00 (Pensco Loan)<br>**Total: $9,850,000.00** | $9,725,376.27 (CFA Loan)<br>**Total: $9,725,376.27**<br>(Pensco did not file a POC for this Debtor) |
| SCHEDULE E<br>Unsecured Priority Claims | -0- | $5,500.00 (NYC Taxation)<br>**Total: $5,500.00** |
| AMENDED SCHEDULE F<br>Unsecured Non-Priority Claims<br>(filed 3/11/09) | $500,000.00 (Crown Fncl.)<br>$38,250.00 (Fidelity) (disputed) – no POC<br>$153,000.00 (Lamar) (disputed) – no POC<br>$75,000.00 (MediaMax) (disputed) – no POC<br>**Total: $766,250.00** | $500,000.00 (Crown Fncl.)<br>**Total: $500,000.00** |

## NOBLE SCHEDULES

| NOBLE | SCHEDULES | CLAIMS REGISTER |
|---|---|---|
| SCHEDULE A<br>Real Property<br>(148 W. 111th) | "unknown" (Appraisal conducted by Originator's Resource Group, dated March 19, 2009, shows an appraised value of $2,500,000.00) | N.A. |
| SCHEDULE B<br>Personal Property | $12,500.00 (household, machinery, office equipment)<br>**Total: $12,500.00**<br>(debtor lists an "unknown" amount of cash deposited into the single account of Vargas Realty. Pursuant to the Debtor's Operating Report, dated August 31, 2009, Noble holds approximately $9,768.00 in cash)<br>(While Debtors admit to having one office located at the Properties and having a combined $50,000.00 in personal property, Debtor has failed to reflect such amounts in an updated Schedule B. ¼ of the combined personal property, representing $12,500.00, will be allocated to each Debtor for the purposes of this schedule.) | N.A. |
| 3rd AMENDED SCHEDULE D<br>Secured Claims<br>(filed on 5/26/09) | $9,600,000.00 (CFA Loan)<br>$250,000.00 (Pensco Loan)<br>$3,324.17 (ECB Lien)<br>**Total: $9,853,324.17** | $9,725,376.27 (CFA Loan)<br>**Total: $9,725,376.27**<br>(Pensco did not file a POC for this Debtor) |
| SCHEDULE E<br>Unsecured Priority Claims | -0- | $4,352.44 (NYS Taxation)<br>$1,650.00 (NYC Taxation)<br>$410.16 (IRS)<br>**Total: $6,412.60** |
| AMENDED SCHEDULE F<br>Unsecured Non-Priority Claims<br>(filed on 3/11/09) | $500,000.00 (Crown Fncl.)<br>$38,250.00 (Fidelity) (disputed) – no POC<br>$153,000.00 (Lamar) (disputed) – no POC<br>$75,000.00 (MediaMax) (disputed) – no POC<br>**Total: $766,250.00** | $500,000.00 (Crown Fncl.)<br>$1,650.00 (NYC Taxation)<br>$3,144.31(NYS Taxation)<br>$113.14 (IRS)<br>**Total: $503,257.45** |

## B. PROPOSED CONSOLIDATED SCHEDULE AND CLAIMS REGISTER

| DEBTORS | SCHEDULES | CLAIMS REGISTER |
|---|---|---|
| SCHEDULE A<br>Real Property<br>(136 W 111th)<br>(140 W 111th)<br>(144 W 111th)<br>(148 W. 111th) | **$10,600,000.00**<br>(pursuant to the appraisal conducted by Originator's Resource Group, dated March 19, 2009) | N.A. |
| SCHEDULE B<br>Personal Property | $50,000.00 (household, machinery, office equipment)<br>$230.00 (ConEd security deposit)<br>**Total: $50,230.00**<br><br>(Debtors lists an "unknown" amount of cash deposited into the single account of Vargas Realty. Pursuant to the Debtor's Operating Report, dated August 31, 2009, Debtors' collectively hold approximately $491,069.00 in cash) | N.A. |
| AMENDED SCHEDULE D<br>Secured Claims<br>(filed on 5/26/09) | $9,600,000.00 (CFA Loan)<br>$250,000.00 (Pensco Loan)<br>**Total: $9,850,000.00** | $9,725,376.27 (CFA Loan)<br>$279,840.68 (Pensco Loan[9])<br>**Total: $10,005,216.95** |
| SCHEDULE E<br>Unsecured Priority Claims | -0- | $4,921.19 (IRS)<br>$4,367.26 (NYS Taxation)<br>$8,800.00 (NYC Taxation)<br>**Total: $18,088.45** |
| AMENDED SCHEDULE F<br>Unsecured Non-Priority Claims<br>(filed on 3/11/09) | $500,000.00 (Crown Fncl.)<br>$38,250.00 (Fidelity)<br>$1,058.77 (ConEd)<br>$-0- (A.Lichenstein)<br>$153,000.00 (Lamar) (disputed) – no POC<br>$75,000.00 (MediaMax) (disputed) – no POC<br>$17,000.00 (Approved Oil) (disputed) – no POC<br>$1,100.00 (Legal Services) (disputed) – no POC<br>**Total: $785,408.77** | $500,000.00 (Crown Fncl.)<br>$87,951.12 (Fidelity)<br>$1,999.43 (ConEd)<br>$247,000.00<br>(A.Lichenstein[10])<br>$2,944.19 (IRS)<br>$3,179.11 (NYS Taxation)<br>$1,650.00 (NYC Taxation)<br>**Total: $844,723.85** |

---

[9] Pensco only filed a POC against Vargas Realty, however, the Pensco Loan was entered into with all 4 Debtors.
[10] Creditor's POC references 4 separate bankruptcy cases, evidencing Creditor's intent to file a POC against each Debtor. However, Creditor's POC only "of record" against Debtor Vargas Realty.

**OPERATING REPORTS**

Pursuant to the requirements of the Office of the United States Trustee for the Southern District of New York, the Debtors have prepared and filed monthly operating reports with the Bankruptcy Court which sets forth information concerning the Debtors' ongoing business operations. Copies of such reports may be obtained from the Bankruptcy Court during normal business hours, or may be obtained upon written request made to counsel for the Debtors.

According to the Operating Reports, the Debtors generate monthly rental income in the approximate amounts as follows:

| | PROPERTY | MONTHLY RENTAL INCOME |
|---|---|---|
| E.R. Properties, Inc. | 136 West 111th Street, New York, New York (Block: 1820 Lot: 51) | $24,412.00 |
| V&R Realty Corp. | 144 West 111th Street, New York, New York (Block: 1820 Lot: 54) | $15,176.00 |
| Noble Realty Corp. | 148 West 111th Street, New York, New York (Block: 1820 Lot: 57) | $22,611.00 |
| Vargas Realty Enterprises, Inc. | 140 West 111th Street, New York, New York (Block: 1820 Lot: 53) | $26,170.00 |

The Debtors have each filed Operating Reports through the period ending on August 31, 2009. According to the Debtors' Operating Reports, as of August 31, 2009, the following sums were being held in the Debtors' DIP Accounts:

| | |
|---|---|
| E.R. Properties, Inc. | $12,031.00 |
| V&R Realty Corp. | $21,430.00 |
| Noble Realty Corp. | $9,768.00 |
| Vargas Realty Enterprises, Inc. | $447,840.00 |

## ADVERSARY PROCEEDINGS

On May 25, 2009, each Debtor commenced an Adversary Complaint seeking to avoid the CFA Note and CFA Security Documents under docket numbers 09-10251, 09-10252, 09-10253, 09-10254 (the "CFA Adversary Proceedings"). CFA moved to dismiss the CFA Adversary Proceedings and said motion was granted by the Dismissal Order on August 3, 2009. On August 12, 2009, Debtors filed a notice of appeal of the dismissal of the CFA Adversary Proceedings to the United States District Court, under 28. U.S.C. Section 158(a)(1).

On May 25, 2009, each Debtor also commenced an Adversary Complaint against Pensco and CFA under docket numbers 09-10247, 09-10248, 09-10249 and 09-10250 ("Pensco Adversary Proceedings"). These Adversary Proceedings seek to avoid the Pensco Claim and also certain Notes originated by Pensco which were subsequently assigned to CFA and comprise part of CFA's Note. An Order was submitted on August 5, 2009 to consolidate the Pensco Adversary Proceedings. On or about September 29, 2009, the Debtors dismissed the Pensco Adversary Proceedings with prejudice. Thus, the Pensco Claim is no longer disputed by the Debtors.

## SINGLE ASSET REAL ESTATE DESIGNATION

On April 7, 2009 CFA filed a motion, for inter alia a declaration that the CFA Mortgage was secured in each of the Debtors' cases as a "single asset real estate" within the meaning of Code 101(51B). The motion argued on June 9, 2009, at which time a ruling from the bench was issued finding that each of the Debtors qualified as a "single asset real estate". The Debtors moved to reargue this designation, and said motion was denied by Memorandum Decision and Order Denying Motion for Re-argument dated July 23, 2009.

## CFA'S MOTION FOR RELIEF FROM STAY

On April 7, 2009, Proponent filed a motion for relief from stay pursuant to 11 U.S.C. Section 362(d)(1) due to the Debtors' failure to make any adequate protection payments to CFA. The motion for relief from stay was originally scheduled for May 5, 2009. A hearing on CFA's motion for relief from stay was held on June 9, 2009, at which time the Court adjourned the matter for the purpose of conducting an evidentiary hearing. An evidentiary hearing has been adjourned indefinitely and the motion is currently being held in abeyance. Additionally, due to the Debtors failure to make adequate protection payments to CFA, CFA believes it is entitled to relief from stay pursuant to 11 U.S.C. Section 362(d)(3).

## DEBTORS' PROPOSED PLAN

On May 31, 2009, the Debtor filed the Debtors' Plan but did not file the required Disclosure Statement. The Debtors' Plan provided that the Debtors would keep the Properties and repay any Allowed Claims. The Debtors intended to fund the Debtors' Plan by securing financing in the

amount of $7,000,000.00 plus a new capital contribution in the amount of $250,000.00 from Victor Vargas.

On August 31, 2009, the Debtors filed an Amended Plan of Reorganization and Disclosure Statement ("Debtors' Amended Plan").

The Debtors' Amended Plan is predicated on numerous contingencies. First, the Debtors' Amended Plan proposes to make distributions on the later of: (i) 120 days following a final determination of the Appeal or (ii) the Effective Date of their Amended Plan (which is the day after the Confirmation Order). In light of the fact that the Debtors have not sought an expedited Appeal, it is highly unlikely that the Appeal will be decided before 120 days following the Effective Date of the Debtors' Amended Plan. Thus, CFA believes that no distributions under the Debtors Amended Plan will be made until 120 days after a final determination of the CFA Secured Claim.

If the Debtors succeed on the Appeal, within 120 days thereafter, the Debtors' propose to secure financing from an undisclosed source, in a maximum amount of approximately $7,500,000.00 to pay creditors. Yet, in light of the Debtors' poor credit history, prior defaults and pending Bankruptcy the availability of financing is clearly speculative. If the Debtors' do not succeed on the Appeal, this proposed financing will be insufficient to repay CFA's Secured Claim. However, the Debtors propose to wait until the expiration of the 120 day period anyway, at which point they intend to adopt the liquidation Plan originally proposed by CFA, (which notably has subsequently been amended). CFA believes that the Debtors' Plan is non-confirmable on its face. As a result, Proponent believes that the Fourth Amended Plan it has proposed, a summary of which is set forth below, provides for the greatest recovery for all Creditors in this case.

## APPLICATION FOR SUBSTANTIVE CONSOLIDATION

The Proponent's Fourth Amended Plan is conditioned (and dependent) on the substantive consolidation of each of the Debtors' estates. As will be set forth herein, it is clear that the balancing of the equities and legal precedent strongly favors the substantive consolidation of each of the Debtors' estates. To clarify, Proponent seeks to consolidate the cases entirely and not just for purposes of voting or distributions under the Plan. To this end, Proponent's Plan contemplates that post-confirmation the Debtors shall pay consolidated quarterly Trustee fees, rather than quarterly Trustee fees for each of the four Debtors separately.

The power to substantively consolidate comes from the general equity jurisdiction of a court of bankruptcy. *See* Pepper v. Litton, 308 U.S. 295, (1939), as implemented by section 105(a) of the Code which authorizes the court to issue orders necessary to carry out the provisions of the Code. *See* In re Richton International Corporation, 12 B.R. 555, 557 (1981).

There are two overriding factors when considering a request for substantive consolidation: (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, and (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *See* In re Augie/Restivo Baking Company, Ltd., 860 F.2d

17

515, 518 (1988). As is more fully set forth below, both of the foregoing factors are met in this case. None of the Debtors' creditors can claim that it extended credit to any of the Debtors based on that particular Debtors' separate identity and credit-worthiness. To be sure, both CFA and Pensco (comprising the only voluntary secured lenders of any of the Debtors) secured their loans with assets of all Debtors collectively and not just one particular Debtor. Furthermore, the Debtors readily admit that all of their affairs are intertwined and overlapping, making it exceedingly difficult to separate the assets and liabilities of each of the Debtors.

Furthermore, some specific factors that a court will consider when deciding whether substantive consolidation is warranted, include: the unity of interests and ownership between the various corporate entities, the existence of parent and inter-corporate guarantees on loans, the degree of difficulty in segregating and ascertaining individual assets and liability, and the transfer and commingling of assets without formal observance of corporate formalities. *See* In re Vecco Construction Industries, 4 B.R. 407 (E.D.Va.1980).

There is no dispute that each of the Debtors maintains a unity of interest and ownership with the others. Furthermore, the Debtors have collectively entered into inter-corporate loans (in particular, with secured creditor CFA). Courts will give weight to substantive consolidation hence it is clear that creditors did not extend credit on the basis of just one Debtor's identity and credit-worthiness. *See* In re Donut Queen, Ltd., 41 B.R. 706 (1984). In our case, CFA clearly underwrote the loan on the combined credit of all of the debtors as evidenced by the execution of a single note and mortgage, which were cross-collateralized against each of the properties owned by each of the Debtors. The same can be said for Pensco's Loan.

Debtors' counsel readily admits that the business operations are shared, overlapping, and run by the same personnel. Debtors' counsel further admits that expenses are shared amongst the 4 Debtors and allocated based, not on actual expenses incurred at each of the Properties, but rather in proportion to the number of units in each building as a percentage of the aggregate number of units collectively owned by Debtors. Consequently, it would be exceedingly difficult to accurately account for the expenses attributable amongst each of the Debtors.

Furthermore, Debtors readily admit to routinely transferring assets amongst each of the Debtors without formal observance of corporate formalities and, even more significantly, commingle assets and business functions. Debtors admit that the business operations are shared, overlapping, and run by the same personnel and expenses are shared amongst each of the four Debtors. Furthermore, Debtors readily admit that rent collected from each of the Properties is deposited into the single bank account of Vargas Realty Enterprises, Inc. Consequently, it would be exceedingly difficult to accurately account for the assets attributable amongst each of the Debtors.

It is important to note that Courts will consider whether or not creditors generally relied on the separate credit-worthiness of an individual debtor, or dealt solely with one debtor without knowledge of its interrelationship with the others. *See* In re Richton at 559. In the present case, it cannot be said that any of the creditors relied solely on the financial condition of only one of the Debtors without consideration for the joint operations of all Debtors when doing business with

18

Debtors, and thus it cannot be said that the prejudice to any creditors as a result of consolidation outweighs the administrative convenience and prejudice to the viability of the Fourth Amended Plan proposed herein.

It is clear from the foregoing that each of the Debtors has, for all intents and purposes, acted as one credit entity. To be sure, each of the Debtors are commonly owned and controlled. They each own contiguous real estate and admittedly operate such real estate business as a single enterprise, sharing personnel and expenses as well as cash flow and assets from operations thereof. The Debtors have dealt with and held themselves out to creditors as a solitary enterprise and credit risk as evidenced by, among other things, the loan given by CFA to all of the Debtors collectively and the loan given by Pensco to all of the Debtors collectively. To allow each of the Debtors to now keep assets in separate debtor estates would substantially prejudice CFA (the largest creditor of the Debtors) as well as Pensco, both of whom relied on the inter-relationship amongst the Debtors as a material condition to extending their loans to the Debtors collectively.

The balancing of the equities set forth above is in favor of substantively consolidating all of the assets in each of the Debtors' estates into one estate to satisfy all of the creditors of all of the Debtors. The potential prejudice to CFA and Pensco alone in underwriting their loans against all of the Debtors far outweighs any claim (of which there is none) that any other creditor agreed to extend credit to only one of the Debtors based solely on such Debtors' individual credit-worthiness and without knowledge of its interrelationship with the other Debtors or the joint operations of all Debtors. Accordingly, the Fourth Amended Plan proposed herein is conditioned on the substantive consolidation of the Debtors' estates for all purposes, including the post-confirmation of U.S. Trustee's Fees.

## THE PLAN

Pursuant to 11 U.S.C. Section 1123(a)(5)(D), the Proponent proposes the appointment of Fred Ringel, Esq. an attorney with the firm Robinson Brog Leinwand Greene Genovese & Gluck P.C. 1345 Avenue of the Americas, 31st Floor, New York, New York 10105-0143 to serve as the Liquidation Trustee (the "Liquidation Trustee") in accordance with the Liquidating Trust Agreement (the "Liquidation Trust Agreement"), annexed hereto as **Exhibit A**. The Liquidation Trustee shall be compensated in accordance with Section 7.8 of the Liquidating Trust Agreement, and shall bill his time at the rate of $450 per hour. The Liquidating Trust Agreement currently provides there is no bond requirement, however, the Liquidating Trustee is willing to post a bond in an amount set by the Court so long as the Debtors' Estates are responsible for the payment of the expense associated with a bond. Prior to execution, the Liquidating Trust Agreement shall be revised to reflect the amount of the bond set by the Court at the Confirmation Hearing. The Liquidating Trust Agreement provides that the Liquidating Trustee shall receive quarterly payments of $4,500.00, which shall compensate him for 10 hours of time in each quarter. Further the Liquidating Trust Agreement provides that the Liquidating Trustee may apply for additional fees for any services rendered in excess of 10 hours in each quarter at the rate of $450.00 per hour.

The Liquidation Trustee will be authorized to sell substantially all of the assets of the Debtors, including the Properties and the improvements thereon at the Public Auction Sale to be held no later than 60 days after the confirmation of the Fourth Amended Plan. On the Effective Date, the Liquidating Trustee shall create a liquidation trust (the "Liquidation Trust") pursuant to that certain Liquidation Trust Agreement, from which payment of Allowed Claims shall be paid. The Debtors shall relinquish any and all rights in and to the Liquidation Trust (subject nonetheless to the terms and conditions of this Disclosure Statement, the Fourth Amended Plan, and the Liquidation Trust Agreement), which shall be transferred to the Liquidation Trustee, for and on behalf of the Holders of Allowed Claims and Post-Confirmation U.S Trustee fees.

-       In connection with the Public Auction Sale, Proponent has agreed to credit bid as stalking horse bidder, the CFA Credit Bid in the amount of $10,000,000.00 (the "CFA Credit Bid") as permitted by 11 U.S.C. §363(k), to acquire the Properties free and clear of all Claims, liens, encumbrances and Interests. The sale to Proponent will be subject to higher or better bids, in accordance with the Bidding Instructions set forth below, which are subject to Court approval. No offers will be considered of less than $10,450,000.00 (the "Minimum Overbid") which is an amount equal to the CFA Credit Bid plus the minimum applicable Broker's Commission (as defined below).

The CFA Credit Bid is in an amount that is less than CFA's Allowed Claim on the Effective Date of the Fourth Amended Plan, which will result in the increase of the pro rata share of the remaining Approved Claims of Unsecured Creditors. Notwithstanding the foregoing, if CFA is the successful Purchaser at the Public Auction Sale, CFA will agree to accept title to the Properties free and clear of all, liens, claims and encumbrances in full satisfaction of its Claims against the Debtors. If CFA is not the Purchaser of the Properties, in full satisfaction of its Claims against the Debtors, the Liquidation Trustee shall pay the sum of $10,000,000.00, plus 75% of all Public Auction Sale proceeds (the "Sale Proceeds") which remain after the payment of the applicable Broker's Commission up to a maximum aggregate payment to CFA in the amount of $10,375,000.00 ("CFA's Maximum Recovery"). Any Sale Proceeds not payable to CFA or the Broker, in addition to the CFA Cash Collateral, will be used to pay Allowed Claims in the order of priority according to the Bankruptcy Code.

In order to generate the most exposure for the Public Auction Sale, upon the Effective Date the Liquidation Trustee shall retain Massey Knakal Realty Services (the "Broker") to market the Properties. The retention of the Broker shall be on substantially the same terms and conditions set forth in a proposed retention contract annexed hereto as **Exhibit B**, which provides that in the event CFA or its designated successor or assign is the Purchaser at the Public Auction Sale, the Broker shall not be entitled to receive a commission for their services. However, if any other party is the successful Purchaser, the Broker shall be entitled to a commission in the amount of 4.5% of the Purchase Price as set forth in the contract (the "Commission") (subject nonetheless to the Minimum Overbid). Additionally, upon the Effective Date the Liquidation Trustee shall be authorized to use a portion of the CFA Cash Collateral in order to pay the cost associated with publishing the notice of the Public Auction Sale in a regional newspaper designated by the Court.

On the Effective Date, the following assets (the "Liquidation Trust Assets") shall vest in the Liquidation Trust:

(a)     The Debtors shall transfer all Cash in the DIP Accounts to the Liquidation Trust. Currently there is approximately $491,069.00 to be deposited in the Liquidation Trust;

(b)     All pre-Effective Date litigation or potential litigation claims, including adversary proceedings, avoidance actions, and objections to claims shall be assigned in trust to the Liquidation Trustee, as a litigation trustee;

(c)     The Debtors' remaining assets, which consist only of the books and records of the Debtors and similar documents pertaining to the Debtors and the tenants at the Properties, shall be assigned and delivered to the Liquidation Trustee; and

(d)     The Properties.

On the Effective Date herein, without any further action, all of the Properties of the Debtors' Estate shall vest in The Liquidation Trustee and also be deemed part of the Liquidation Trust Assets. The Liquidation Trustee shall distribute all property of the Debtors, free and clear of all claims, liens and interests, in accordance with the Fourth Amended Plan and the Liquidation Trust Agreement.

On or before the Effective Date herein, Debtor shall in any event be obligated to execute and deliver to the Liquidation Trustee all such documents, authorizations, consents, and directions to third-parties, necessary to effectuate the Fourth Amended Plan, including, without limitation, deeds, bills of sale, assignments, consents to transfer contents of bank accounts, and such other documents necessary to effectuate the intent of this Fourth Amended Plan (collectively, the "Transfer Documents"). Upon confirmation of the Fourth Amended Plan, Debtor will be deemed to have granted to the Liquidation Trustee a power of attorney (coupled with an interest) for such Liquidation Trustee to execute any such Transfer Documents on behalf of Debtor if Debtor has not executed and delivered such Transfer Documents on or before the Effective Date.

## Classification of Claims and Interests

### A. General Overview

As required by the Bankruptcy Code, the Fourth Amended Plan classifies Claims and Equity Interests in various Classes according to their right to priority of payments as provided in the Bankruptcy Code. The Fourth Amended Plan states whether each Class of Claims or Equity Security holders is Impaired or Unimpaired. The Fourth Amended Plan provides the treatment each Class will receive under the Fourth Amended Plan.

### B. Unclassified Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Fourth Amended Plan does not classify Administrative Claims entitled to priority treatment under section 507(a)(2) of the Bankruptcy Code or Claims of Governmental Units entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. They are not considered Impaired and they do not vote on the

Fourth Amended Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed the following claims in a Class. The treatment of these Claims is provided below.

    **1.**    **(a)**    **Administrative Claims.** Administrative Claims are the costs and expenses of administration of this Case, allowable under section 503(b) of the Bankruptcy Code, other than Bankruptcy Fees. Administrative Claims include Claims for the provision of goods and service to the Debtors after the Petition Date, the liabilities incurred in the ordinary course of the Debtors' business (other than claims of governmental units for taxes or interest or penalties related to such taxes) after the Petition Date, Claims of professionals, such as attorneys, appraisers, and accountants, retained pursuant to an order of the Bankruptcy Court, for compensation and reimbursement of expenses under section 330 of the Bankruptcy Code, and tax claims for the period from the Petition Date to the Effective Date of the Fourth Amended Plan.

    Pursuant to the Bankruptcy Code, the Bankruptcy Court must rule on all professional compensation and expenses before the compensation and expenses will be allowed. The professional in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses, and the Bankruptcy Court must rule on the application. Only the amount of compensation and reimbursement of expenses allowed by the Bankruptcy Court will be owed and required to be paid under this Fourth Amended Plan as an Allowed Administrative Expense Claim. Each professional person who seeks compensation must file with the bankruptcy Court and serve on all parties required to receive notice, an application for compensation and reimbursement of expenses no later than ten after the Effective Date. All Allowed Administrate Expense Claims shall be paid from the Liquidating Trust, within three (3) days from the entry of a Judicial Order approving an application or in accordance with an agreement between the parties with respect thereto.

    Each Administrative Claim, to the extent not previously paid, which has been approved by the Court, shall be paid by the Liquidation Trustee in Cash in full on the later of (i) the Effective Date, the date payment of such Claim is due under the terms thereof or applicable law, or three (3) business days after such Claim becomes an Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Liquidation Trustee and the holder of such Claim. Administrative Claims shall be paid from CFA's Cash Collateral.

    Article 2 of the Fourth Amended Plan sets a final date for the filing of Administrative Claims against the Debtor. The Administrative Bar Date is (i) any date set by Order of the Bankruptcy Court subsequent to which a Proof of Administrative Claim is not timely filed, or (ii) if no such date is set, the first Business Day which is thirty (30) days after the Effective Date.

    **(b)**    **Bankruptcy Fees.** All post confirmation fees and charges assessed against the Debtors until the entry of a final decree in this matter, under section 1930 of title 28 of

the United States Code, including, without limitation, fees payable to the Office of the United States Trustee shall be paid by the Liquidation Trustee in Cash in full as required and in such amounts as provided by statute. All of the aforementioned fees shall be paid by the Debtors until the confirmation of the Plan.

(c) **Administrative Expense Claim Bar Date and Objections to Administrative Expense Claims.** Under the Fourth Amended Plan, requests for payment of Administrative Expense Claims must be asserted by the earlier of: (i) the deadline which may be set by order of the Bankruptcy Court; or (ii) thirty (30) days after the Effective Date. Any Administrative Claims not timely and properly filed by this deadline may be forever barred and discharged. The Liquidation Trustee shall have forty-five (45) days from the Effective Date to challenge any such Administrative Claims filed, or such longer time as the Bankruptcy Court may authorize.

Holders of Allowed Administrative Claims will be paid the full amount of such Allowed Administrative Claim as follows: (1) Debtor or Liquidation Trustee shall pay the Allowed Administrative Claim in cash on the later of (i) the Effective Date or (ii) the Allowance date of such Administrative Claim, or (2) the Allowed Administrative Claim may be paid at such time or in such manner as agreed to by the Holder of such Allowed Administrative Claim.

Any Claims for Allowed Administrative Expenses, which are not paid on the Effective Date, shall not be discharged and shall retain their administrative priority under 11 U.S.C. § 507(a)(1) in this Bankruptcy Case or in a subsequent case under Chapter 7.

**2. Priority Tax Claims.** Priority Tax Claims are Claims for certain unsecured income, employment and other taxes described by Bankruptcy Code § 507(a)(8). The Bankruptcy Code requires that each Holder of such a Section 507(a)(8) Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period not exceeding five years from the date of the assessment of such tax. Allowed Priority Tax claims shall be paid by the Liquidation Trustee, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Liquidation Trustee and such Governmental Units.

Currently, proofs of claim have been filed seeking Priority Tax Claims in the approximate amount of $18,088.45. Asserted Priority Tax Claims will remain subject to the procedures for objections as provided in Section 3.2 of the Fourth Amended Plan and explained in the Section entitled "Disputed Claims and Interests" of this Disclosure Statement.

## C. Designation and Treatment of Classes Under The Fourth Amended Plan

Article 4 of the Fourth Amended Plan classifies the various Claims against and Interests in the Debtors into four (4) classes of Claims and one (1) class of Interests:

| | | |
|---|---|---|
| Class 1 - | CFA Secured Claim |
| Class 2 - | Classified Priority Claims |
| Class 3 - | Unsecured Claims |
| Class 4 - | Allowed Interests |

**Class 1 – CFA's Secured Claim.** Class 1 consists of the secured claim of Proponent on account of its Loan to the Debtors. The approximate amount due and owing to CFA on account of its claim was $9,725,376.27 as of the Petition Date.

**Class 2 – Classified Priority Claims.** Class 2 consists of all Allowed Claims, other than Administrative Claims, Bankruptcy Fees, and Priority Tax Claims (which are unclassified and provided for elsewhere) to the extent entitled to priority under section 507 of the Bankruptcy Code. Claims that may be classified in Class 2 may include, for example, certain claims of employees of the Debtors for wages, salaries and commissions or contributions to employee benefit plans up to an aggregate amount of $10,000.00 per employee. The Proponent believes that the total claims in this class aggregate less than $5,000.00.

**Class 3 – Unsecured Claims**. Class 3 consists of all Unsecured Claims against the Debtors, including but not limited to the Pensco Claim and any Deficiency Claims against Debtors. This class does not include any Deficiency Claim by CFA as CFA has agreed to waive its Deficiency Claim in connection with this Plan. Based upon the Debtors' Schedules, Proponent believes that the claims in this class total approximately $1,124,564.53 as of the Petition Date.

**Class 4 – Allowed Interests.** Class 4 consists of the Allowed Interests of the Equity Security holders in the Debtors.

*Unimpaired Classes* - Claims in Class 2 are unimpaired under the Fourth Amended Plan. The votes of Holders of Claims in Class 2 are therefore NOT being solicited, are NOT entitled to vote to accept or reject the Fourth Amended Plan and are deemed to have accepted the Fourth Amended Plan.

*Impaired Classes* - Claims in Classes 1 and 3 and Allowed Interests in Class 4 are impaired under the Fourth Amended Plan. The votes of Holders of Claims are being solicited and are entitled to vote to accept or reject the Fourth Amended Plan. Class 4 will receive no distribution from the Debtor's estate or the Liquidation Trust and therefore is deemed to have rejected the Fourth Amended Plan.

**TREATMENT OF CLAIMS AND INTERESTS CLASSIFIED UNDER THE FOURTH AMENDED PLAN**

Articles 4 and 5 of the Fourth Amended Plan provide for the treatment of Claims and Interests classified in Article 3 of the Fourth Amended Plan as follows: Each class of Claims and Interests shall receive the following treatment under the Fourth Amended Plan:

### Class 1 – CFA Secured Claim

Upon the completion of the Public Auction Sale, if CFA is the Purchaser it shall receive the consideration provided for in section 7.1.1 of the Fourth Amended Plan, the provisions of which are set forth below. In the event Proponent is not the Purchaser of the Properties under Article 7 of the Fourth Amended Plan, CFA shall receive the consideration provided for in section 7.1.2 of the Fourth Amended Plan, the provisions of which are set forth below.

7.1.1.  In full and complete satisfaction of its Allowed Claim, CFA or its successor and or assign shall receive, on a date no later than ten (10) days after the entry of the Sale Approval Order, a deed transferring title to the Properties free and clear of all liens, claims and encumbrances in exchange for CFA's Credit Bid in the sum of $10,000,000.00 and CFA's release of any Deficiency Claim against Debtors (but not against any guarantors of the CFA Loan) or right to the CFA Cash Collateral, **or**

7.1.2  In full and complete satisfaction of its Allowed Claim, on a date no later than 3 days after the closing to the Purchaser, CFA shall: (a)  receive all Sale Proceeds up to an amount equal to the CFA Credit Bid, plus 75% of Sale Proceeds in excess of the Minimum Overbid that remain after the payment of the applicable Broker's Commission ("Net Sale Proceeds"), up to CFA's Maximum Recovery of $10,375,000.00; (b) release its lien on the CFA Cash Collateral and (c) waive its Deficiency Claim against Debtors (but not against any guarantors of the CFA Loan).  The CFA Cash Collateral and all Sale Proceeds not payable to CFA shall be utilized to pay Allowed Claims in the order of priority as provided for in the Bankruptcy Code and this Fourth Amended Plan.  Any amounts in excess of the payments due to CFA and the Broker under this Fourth Amended Plan shall be referred to herein as the "Excess Proceeds".

### Class 2 – Classified Priority Claims.

In full satisfaction, release and discharge of the Priority Claims, the holders of Priority Claims shall receive the following treatment:  on the Effective Date, or as soon as practicable after such Claims become Allowed Claims, each holder of a Priority Claim shall receive payment from the Liquidation Trustee, (i) in Cash, in the full amount of its Priority Claim, or (ii) as may be otherwise agreed in writing between the holder of such Claim.  Priority Claims will be paid from the CFA Cash Collateral and also, provided CFA is not the successful Purchaser, from the Excess Proceeds, if any.

**Class 3 – Unsecured Claims**

In full satisfaction, release and discharge of the Unsecured Claims (including Deficiency Claims against Debtors – noting that CFA has agreed to waive its Deficiency Claim and is not part of this class ), the holder of an Allowed Unsecured Claim shall receive within thirty (30) days from the closing of the sale of the Properties to the Purchaser, payment in cash, equal to its Pro Rata share of Available Cash (which payments shall be subject nonetheless to the Conditional Payments Schedule defined below). The payments made by the Liquidation Trustee to Allowed Claims in Class 3 shall be made with the presumption that all then existing Disputed Claims will be deemed Allowed Claims. Thereafter (and continuing until there are no more Disputed Claims in Class 3 or in Classes with priority to Class 3), when and in the event that any Disputed Claim is not deemed an Allowed Claim (the amount of such rejected Disputed Claim being the "Released Disputed Capital"), the Liquidation Trustee shall make additional disbursements to the Allowed Claims in Class 3 in an amount representing each Allowed Claims' pro-rata share of such Released Disputed Capital (such procedure being the "Conditional Payments Schedule")

**Class 4 – Allowed Interests.**

On the Effective Date, Allowed Interests in the Debtors shall be cancelled. Class 4 consists of all Claims of Insider(s) and Equity Interests in the Debtors, including, without limitation, options, warrants and other rights to acquire equity interests in the Debtor. Since the Proponent does not anticipate full payment of Allowed Class 3 Claims, the Claims of Insider(s) and Equity Interests will likely receive nothing from the liquidation of the Debtors' estate. Accordingly, Class 4 will receive no distribution from the Debtor's estate or the Liquidation Trust and therefore is deemed to have rejected the Fourth Amended Plan.

The table below provides a summary of the classification and treatment of Claims and Interests under the Fourth Amended Plan. The figures set forth in the table below represent the Proponent's best estimate of the total amount of Allowed Claims and Allowed Interests in the Case. These estimates have been developed based on an analysis of the Schedules filed by the Debtors, the Proofs of Claims and Proofs of Interests filed by Creditors and Interest Holders, and certain other documents of public record.

Although the Proponent believes that the amounts of the claims set forth below are substantially correct, there can be no assurance that Claims and Interests will be allowed by the Bankruptcy Court (or that any or all Disputed Claims will be deemed Allowed Claims) in the amounts set forth below:

| Class and Estimated Amount | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| **Class 1** $9,725,376.27 as of the Petition Date, plus interest on the unpaid principal at the rate of 24%. | CFA W. 111 Street, L.L.C. | **Impaired.** On the Effective Date the amount of the CFA's Allowed Secured Claim will exceed the fair market value of the Properties. However, in full and complete satisfaction of its Allowed Secured Claim, CFA will agree to credit bid the sum of $10,000,000.00 as a stalking horse bidder to acquire the Properties free and clear of all liens. The sale to Proponent will be subject to higher or better offers to be made at a Public Auction Sale to be conducted by the Liquidation Trustee. The Properties will be sold free and clear of all claims, and the Purchaser shall be afforded the protections of 11 U.S.C. 363(m). If CFA is the Purchaser, title to the Properties shall be transferred to CFA by the Liquidation Trustee no later than 10 days after the entry of the Sale Approval Order (as defined below). If Proponent is not the successful Purchaser at the Public Auction Sale, it shall receive 75% of the Net Sale Proceeds in excess of the Minimum Overbid up to the CFA Maximum Recovery of $10,375,000.00. CFA shall receive payment from the Liquidation Trustee no later than 3 days after the closing to the Purchaser at the Public Auction Sale. If CFA is not the Purchaser, all Available Cash, including but not limited to any CFA Cash Collateral shall paid to creditors by the Liquidation Trustee in the order of priority as provided for in the Bankruptcy Code and this Fourth Amended Plan. |
| **Class 2** Unknown but believed not to exceed $5,000 | Classified Priority Claims (other than Administrative Claims, Bankruptcy Fees, and Priority Tax Claims) | **Unimpaired.** Subject to the provisions of *Article 8* of the Fourth Amended Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Priority Claims, each holder of a Priority Claim shall receive, no later than five days after the Effective Date, Cash, in the full amount of its Priority Claim from the funds held in the Liquidation Trust. |
| **Class 3** $1,124,564.53 (which includes Pensco's Claim) | General Unsecured Creditors | **Impaired.** In full satisfaction, release and discharge of the Unsecured Claims (including any Deficiency Claims against Debtors and the Pensco Claim), the holder of an Unsecured Claim shall receive, payment in cash, equal to its Pro Rata share of Available Cash no later than 30 days after title is transferred to the Purchaser. (subject nonetheless to the Conditional Payments Schedule) |
| **Class 4** | Allowed Interests | **Impaired.** On the Effective Date, all Allowed Interests in the Debtors shall be cancelled. |
| **Unclassified** $148,088.45 (includes Debtors' counsel and accountant fees, priority tax claims and estimated bankruptcy fees) | Administrative Claims, Bankruptcy Fees, and Priority Tax Claims | **Unimpaired.** Each approved Administrative Claim, Bankruptcy Fee, and each Priority Tax Claim, to the extent not previously paid, shall be paid by the Liquidation Trustee in Cash in full on (i) the later of the Effective Date, the date payment of such Claim is due under the terms thereof or applicable law, or three business days after such Claim becomes an Administrative Claim, Bankruptcy Fee, or Priority Tax Claim or (ii) as may be otherwise mutually agreed in writing between the Liquidation Trustee and the holder of such Claim. |

THE FOLLOWING SUMMARY OF THE TERMS OF THE FOURTH AMENDED PLAN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE FOURTH AMENDED PLAN, A COPY OF WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AND WHICH IS INCORPORATED HEREIN BY REFERENCE.

## ANTICIPATED TREATMENT OF PENSCO CLAIM

Now that Pensco is deemed an Allowed Claim, Pensco's Claim is treated as unsecured since CFA's Loan is undersecured and is secured by the same collateral and holds priority over Pensco.

## DISPUTED CLAIMS AND INTERESTS

Article 10 of the Fourth Amended Plan contains a mechanism for resolving disputes concerning the amount of certain Claims or Interests asserted against the Debtors by any Entity.

**Time to Object.** Unless otherwise ordered by the Bankruptcy Court, objections to the allowance of any Claim or Interest must be filed no later than ninety (90) days after the Effective Date (it being understood that on an after the Effective Date only the Liquidation Trustee may object to Claims or Interests for such 90 day period). Claims or Interests shall be deemed to be Disputed in their entirety if: (i) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been filed, or (ii) any Claim (including an Administrative Expense), or portion thereof, that has not been disallowed pursuant to a Final Order and with respect to which an objection to the allowance thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by the Fourth Amended Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection has not been resolved by a Judicial Order, or (iii) until the earlier of (iii-a) the filing of a timely objection to a Proof of Claim (in which case subparagraph (ii) above shall govern) or (iii-b) the last date to file objections to Claims as established by the Fourth Amended Plan or by Judicial Order, a Claim represented by a Proof of Claim shall be deemed to be a Disputed Claim in its entirety if: (1) the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules, or (2) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated, or (3) no corresponding Claim has been listed in the Schedules.

**PUBLIC AUCTION SALE PROCEDURES**

*Public Auction Sale Procedures*

The sale of the Debtors' Properties to Proponent is subject to higher and better offers based upon pre-qualifying bidders who have submitted "qualifying bids" (as defined in the Bidding Procedures set forth below) which are calculated to result in offers equal to or in excess of the Minimum Overbid. The Liquidation Trustee shall give all creditors notice of the Public Auction Sale. This notice is intended to insure that these parties are aware of the requirements necessary to make a qualified bid for the Properties. Additionally, the Liquidation Trustee shall retain the Broker and shall make the Properties and the Debtors' business records available to any prospective Purchaser of the Properties to conduct due diligence prior to the Public Auction Sale. The Properties will be offered for sale collectively.

The Public Auction Sale will be held on a date no later than 60 days after the Effective Date and Proponent will seek approval of the following terms and conditions for the Public Auction Sale (the "Bidding Procedures"):

(a)     The Public Auction Sale of the Properties will be conducted by the Liquidation Trustee on a date and at a location to be determined by the Liquidation Trustee, which date shall be no later than sixty (60) days after the Effective Date, upon the following terms and conditions;

(b)     An offer for the purchase of the Properties must be a Qualified Competing Bid (as defined below) made by a Qualified Competing Bidder, as provided herein;

(c)     A Qualified Competing Bid shall consist of a timely and unconditional offer (subject nonetheless to any Qualified Financing Contingency Agreement set forth below) for the purchase of the Properties made by a Qualified Competing Bidder, in accordance with the terms hereof and accompanied by (i) a 10% deposit as provided for herein, (ii) a written offer to purchase the Properties for an amount not less than the Minimum Overbid and (iii) an acknowledgement that he, she or it has read and understands these Bidding Procedures and agrees to abide by and to be bound by them ("Qualified Competing Bid");

(d)     An offer for the purchase of the Properties must be submitted by a party which demonstrates an financial ability to consummate the purchase of the Properties (a "Qualified Competing Bidder");

(e)     Each offer must be served five (5) days in advance of the Public Auction Sale upon the Liquidation Trustee, Fred Ringel, Esq. c/o Robinson Brog Robinson Brog Leinwand Greene Genovese & Gluck P.C. 1345 Avenue of the Americas, 31st Floor, New York, New York 10105-0143 Phone: 212-603-6300 and Proponent's counsel, Kriss & Feuerstein LLP, 360 Lexington Avenue, Suite 1200, New York, New York 10017 Attn: Jerold C. Feuerstein, accompanied by evidence satisfactory to the Liquidation Trustee, of the willingness and financial ability of the Qualified Competing Bidder to consummate the transaction no later than fifteen (15) days after entry of the Sale Approval Order (as defined below);

(f)     Proponent shall be deemed to be a Qualified Competing Bidder and the  CFA Credit Bid, a Qualified Competing Bid;

(g)     Each Qualified Competing Bidder (other than Proponent) making a Qualified Competing Bid must deliver the Liquidation Trustee, Fred Ringel, Esq. c/o  Robinson Brog Leinwand Greene Genovese & Gluck P.C. 1345 Avenue of the Americas, 31st Floor, New York, New York 10105-0143 at the time of making such Qualified Competing Bid, a deposit in an amount equal to at least 10% of its Qualified Competing Bid (the "Deposit");

(h)     The Deposit shall be made in immediately available funds (cashier's check, certified check, irrevocable letter of credit, wire transfer or cash);

(i)     If a Qualified Competing Bidder becomes the Purchaser, its Deposit shall be deemed to be non-refundable and shall be forfeited to the Debtors' Estate if such Purchaser fails to close for any reason whatsoever, subject only to the strict compliance with any Qualified Financing Contingency Agreement (as defined below);

(j)     If a Qualified Competing Bidder does not become the Purchaser or the Backup Bidder (as defined below), its Deposit shall be returned to it within three (3) business days after the conclusion of the Public Auction Sale, *provided however,* that the deposit tendered by the Backup Bidder shall be held by the Proponent's counsel until three (3) business days after the closing of the sale to the Purchaser unless the Proponent indicates its intention to close on the Backup Bid, in which case the Backup Bidder's deposit shall be credited to the purchase price or forfeited to the Debtors estate as liquidated damages (subject to CFA's Liquidated Damages Claim, as defined below), as the case may be;

(k)     A Qualified Competing Bid must contain an irrevocable offer to purchase all of the Properties;

(l)     A Qualified Competing Bid must contain material terms and conditions no less favorable to the Debtors' estate, than the CFA Credit Bid;

(m)     A Qualified Competing Bid may be contingent upon financing up to 65% of the Qualified Competing Bid, so long as the Qualified Competing Bidder enters into a Qualified Financing Contingency Agreement (as set forth below) and is in any event able to close on or before the Drop-Dead Closing Date (as defined below) if the Qualified Competing Bidder is the Purchaser.

(n)     A Qualified Competing Bid must provide for a closing date on or before fifteen (15) days after entry of the Sale Approval Order (as defined below), with time being of the essence as against the Purchaser (the "Drop-Dead Closing Date");

(o)     At the Liquidation Trustee's reasonable discretion, any Qualified Competing Bid made by any Qualified Competing Bidder (other than Proponent) who does not attend the Public Auction Sale may be treated as waived and revoked;

(p)     At the time and place of the Public Auction Sale, if one or more Qualified Competing Bids have been timely submitted, and neither wishes to submit a revised, higher and better bid on the record, the highest and best Qualified Competing Bid and such bidder shall be deemed to be the Purchaser;

(q)     At the time and place of the Public Auction Sale if one or more Qualified Competing Bids have been timely submitted, the Liquidation Trustee shall conduct an Public Auction Sale among purchasers and any Qualified Competing Bidder or Bidders that has or have submitted a Qualified Competing Bid or Bids;

(r)     The minimum opening bid at the Public Auction Sale, (other than the bid of Proponent) shall not be less than the Minimum Overbid;

(s)     Subsequent bids made on the record at the Public Auction Sale shall be in minimum increments of $25,000.00;

(t)     At such time as it appears to the Liquidation Trustee, in the exercise of his reasonable discretion, that none of the Qualified Competing Bidders present at the Public Auction Sale are prepared to advance the bidding, the Liquidation Trustee shall (after giving fair warning, on the record, to those entities present) close the bidding on the record and the entity which immediately prior to the close of the bidding shall have submitted the highest and best offer for the purchase of the Properties shall be declared the successful Purchaser;

(u)     In the event that the Purchaser is an entity other than Proponent, then such Purchaser shall be bound by all of the terms of this Fourth Amended Disclosure Statement and the Fourth Amended Plan;

(v)     The Qualified Competing Bid which is second highest at the Public Auction Sale shall be designated as the "Backup Bid" and the second highest Qualified Competing Bidder as the "Backup Bidder" and the Liquidation Trustee shall be authorized to close on a sale to the Backup Bidder in the event the successful bidder fails to close on the sale, *provided however*, that the Proponent shall give the Backup Bidder no less than ten (10) calendar days notice of the successful bidders failure to close and the Liquidation Trustee's intention to close on the Backup Bid (the "Backup Bid Drop-Dead Closing Date") (The Backup Bid Drop-Dead Closing Date or the Drop-Dead Closing Date, as the case may be, being the "Relevant Drop-Dead Closing Date");

(w)     The Liquidation Trustee shall seek to include language in the Sale Approval Order deeming the Purchaser of the Properties to be a purchaser in good faith of the Debtors' Properties entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code;

(x)     Within fifteen (15) days of the Sale Approval Order, the Liquidation Trustee will convey all rights and interest in and to the Properties free and clear of all liens and encumbrances (in accordance with §363(f)) to the Purchaser. The Purchaser will expressly acknowledge and agree that any warranties of any kind or nature whatsoever, express or implied, concerning the Properties, including without limitation, any warranties as to title, suitability for any purpose, merchantability, tenants and any other warranties or representations as to the ownership, physical condition, quality or quantity of them, will be expressly disclaimed. The Purchase will acknowledge that the Properties are being sold "AS IS" "WHERE IS" and "with all faults" and any residential leases set forth on each Debtor's Schedule "G"

shall remain in full force and effect following the Public Auction Sale and conveyance of title to the Purchaser.

(y)     Notwithstanding anything to the contrary containing in the foregoing Bidding Procedures, the failure of such prevailing Qualified Competing Bid (or the Backup Bidder, as the case may be) to close on or before the Drop-Dead Closing Date (or the Backup Bidder Drop-Dead Closing Date, as the case may be) will result in the forfeiture of such party's 10% deposit (half of which will be distributed outside of the Fourth Amended Plan by the Liquidation Trustee to CFA as liquidated damages with respect to the CFA Credit Bid (the "CFA's Liquidated Damages Claim") and the other half of which will be added to the Debtors' estate to be made available for distribution to the Class 3 Unsecured Creditors and otherwise in accordance with the Fourth Amended Plan; *provided, however,* that such party will be entitled to the return of its 10% deposit to the extent it has entered into a Qualified Financing Contingency Agreement with the Liquidation Trustee and such party has timely elected to terminate its obligation to close under and in strict accordance with the terms and conditions of such Qualified Financing Contingency Agreement, if any.

(z)     A "Qualified Financing Contingency Agreement" shall mean an agreement (or provision in a written agreement to purchase) that is acceptable to the Liquidation Trustee, in its reasonable discretion, but in any event, shall: (i) strictly comply with the terms of this Disclosure Statement and the Fourth Amended Plan, and (ii) limit the amount of financing to no more than 65% of the Qualified Competing Bid, and (iii) provide that such Purchaser may only elect to terminate its obligations to close hereunder pursuant to and in accordance with the terms and conditions in the Qualified Financing Contingency Agreement (the "Qualified Election to Terminate") in writing within ten (10) days of becoming the successful bidder (or within five (5) days of being notified by the Liquidation Trustee of its intent to close with respect to a Backup Bidder, provided such Backup Bidder has also entered into a Qualified Financing Contingency Agreement). The failure to make a Qualified Election to Terminate will deem the successful bidder (or Backup Bidder, as the case may be) to have waived its right to terminate its obligations to close pursuant to the Qualified Financing Contingency Agreement and will require the successful bidder (or Backup Bidder, as the case may be) to close on or before the Relevant Drop-Dead Closing Date or forfeit its 10% deposit (in which case such 10% deposit will be distributed in accordance with subsection (y) above).

*Parties in interest who desire to bid for the Properties are strongly urged to make their own physical inspection of the Properties.*

### Public Auction Sale Approval

Within ten (10) days of the Public Auction Sale, the Liquidation Trustee shall make a motion for an order approving the results of the Public Auction Sale, which order shall include, without limitation, approval of the sale to the Purchaser, the Backup Bidder, and that the Public Auction Sale was conducted in accordance with the Bankruptcy Code and Fourth Amended Plan and Fourth Amended Disclosure Statement (the "Sale Approval Order").

## DISTRIBUTIONS UNDER THE FOURTH AMENDED PLAN

### Distributions to Liquidation Trustee.

No later than the Effective Date, the Debtors shall transfer all of its respective rights, title and interest in and to the Liquidation Trust to the Liquidation Trustee. The Liquidation Trustee shall invest the funds in the Liquidation Trust in one or more accounts; provided, however, that all investments shall be made in accordance with Bankruptcy Code § 345.

If the Debtors fail to comply with its transfer obligations herein, the Debtors will be deemed to have granted to the Liquidation Trustee a power of attorney (coupled with an interest) for such Liquidation Trustee to execute any such Transfer Documents on behalf of the Debtors if the Debtors have not executed and delivered such Transfer Documents on or before the Effective Date.

### Payment of Administrative Expenses, Tax Priority Claims and Post Effective Date Fees

On the Effective Date, or no later than three days after the approval by the Bankruptcy Court of any application for compensation and reimbursement of expenses filed by Professional Persons as required by the Fourth Amended Plan, the Liquidation Trustee shall pay the Allowed Administrative Expenses and the Tax Priority Claims from the Liquidation Trust in accordance with the Fourth Amended Plan.

### Dates of Distributions.

Payment of Allowed Claims shall be made on the Effective Date, or as soon thereafter as is practicable, subject nonetheless to the terms contained in this Fourth Amended Plan, including without limitation, with respect to the Conditional Payments Schedule.

### Manner of Distributions.

At the option of the Liquidation Trustee, distributions from the Liquidation Trust may be made in cash, by wire transfer or by a check drawn on a domestic bank. No distributions shall be made on Claims that are less than one hundred dollars ($100.00) in amount, unless a request is made, in writing, to the Liquidation Trustee.

34

Distributions shall be made: (1) at the addresses set forth on the Proofs of Claim or Proofs of Interests filed by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Liquidation Trustee after the date of any related Proof of Claim or Proof of Interest; or (3) at the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Liquidation Trustee has not received a written notice of a change of address. If the distribution to the holder of any Claim or Interest is returned to the Liquidation Trustee as undeliverable, no further distribution shall be made to such holder unless and until the Liquidation Trustee is notified in writing of such holder's then current address. Neither the Debtors not the Liquidation Trustee shall be required to attempt to locate any holder of an Allowed Claim or an Allowed Interest.

The Liquidation Trustee shall also be responsible for pursuing all Claims against the Debtors to recover any portion of CFA's Cash Collateral that was used without authority from the Court during the pendency of this Bankruptcy Case.

## UNCLAIMED DISTRIBUTIONS

The Liquidation Trustee will hold any Unclaimed Distribution and will not be required to take any further action with respect to the delivery of the Unclaimed Distribution. If the Person entitled to such Unclaimed Distribution does not present itself to the Liquidation Trustee within ninety (90) days following the distribution date, the Unclaimed Distribution will go back into the Liquidation Trust for the benefit of other Holders of Claims in the same class as the Holder of the Unclaimed Distribution, and the Unclaimed Distribution will be distributed to such other Persons in accordance with the Fourth Amended Plan terms on the next succeeding distribution date.

## DISTRIBUTIONS WITH RESPECT TO DISPUTED CLAIMS

Unless such objection to a Claim or Interest has been allowed pursuant to a Judicial Order, while an objection to any Claim or Interest is pending, no distribution under the Fourth Amended Plan will be made to the holder of such Disputed Claim or Disputed Interest until entry of a Judicial Order allowing such Disputed Claim or Disputed Interest. However, subject to the restrictions set forth in the next paragraph, there will be set aside and reserved on behalf of such disputed Claim or Interest such cash or property as the holder thereof would be entitled to receive in the event such Claim or Interest was an Allowed Claim or an Allowed Interest on the date of such distribution. The Debtors or the Liquidation Trustee may seek an order of the Bankruptcy Court estimating or limiting the amount of Cash or property that must be deposited in respect of any such disputed Claims or Interests. Cash held in reserve for disputed Claims will be held in trust for the benefit of the holders of such Claims.

The amount to be so segregated on behalf of Disputed Claims depends upon whether such claim is an Unsecured Claim or a claim other than an Unsecured Claim. If a Disputed Claim is not an Unsecured Claim, the Liquidation Trustee shall segregate Cash equal to 100% of the amount which would be distributed on account of such Disputed Claim if such Claim had been an Allowed Claim but for the pendency of the objection. Until such the dispute over the claim is resolved, the

Liquidation Trustee shall also segregate any interest or dividends earned upon such amount it is holding on account of such Disputed Claim.

If the Disputed Claim would have been an Allowed Unsecured Claim but for the pendency of such objection, the Liquidation Trustee shall be obligated to segregate an amount equal to the pro rata share of the amount which would have been distributed on account of such Claim if such Claim had been an Allowed Claim on such date. Deposits in escrow on account of any Disputed Unsecured Claims shall be made annually thereafter, at least ten days prior to the anniversary of the Effective Date until all pending disputes are resolved. The Liquidation Trustee shall also hold any interest or dividends earned on such funds until the dispute over such claim is resolved.

Within 5 days after the entry of a Judicial Order allowing such Disputed Claim or Disputed Interest or within 5 days after the entry of a Final Order disallowing such Disputed Claim or Disputed Interest, the Liquidation Trustee shall distribute all Cash or other property held in escrow with respect to such claim, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim. If such Disputed Claim is denied, the Liquidation Trustee shall distribute the Released Disputed Capital in accordance with the Conditional Payments Schedule. To the extent practicable, the Liquidation Trustee may invest any Cash or other property segregated on account of a Disputed Claim, Disputed Interest, undeliverable distribution, or any proceeds thereof; however, the Liquidation Trustee shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash, other property or proceeds. Any segregated amounts remaining after all Disputed Claims and Interests have been resolved will be retained by the Debtors.

COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Fourth Amended Plan, the Liquidation Trustee shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Fourth Amended Plan shall be subject to such withholding and reporting requirements.

EFFECTIVE DATE

The Effective Date of the Fourth Amended Plan is defined as the first business day after entry of the Confirmation Order.

CONDITIONS TO THE EFFECTIVE DATE

The Fourth Amended Plan contains no conditions to the Court holding the Confirmation Hearing, other than the application for substantive consolidation of Debtors' estates.

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, all of the Executory Contracts and Unexpired Leases to which the Debtors are a party shall be deemed rejected by the Debtors, except the unexpired residential leases in connection with the Properties as set forth on the Debtors' respective Schedule "G", which shall remain unaffected by the Fourth Amended Plan. On or before the Effective Date, the Debtors shall transfer any and all security deposits for all tenants at the Properties to the Liquidation Trustee along with any documentation pertaining to the Properties including but not limited to original leases, Certificates of Occupancy and any and all DHCR records.

A Proof of Claim or request for payment of an Administrative Expense with respect to any Claim arising from, or in connection with, the assumption of an Executory Contract or Unexpired Lease (including, but not limited to, any Cure Amount arising under section 365(b)(1) of the Bankruptcy Code) shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Liquidation Trustee within 30 days after the Confirmation Date. Any such Proof of Claim or request for payment of an Administrative Expense not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors or their successors or its respective properties.

**Rejection Claims**. Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtors pursuant to the Fourth Amended Plan shall be treated as Unsecured Claims. The contracts to be rejected will be set forth on a schedule filed by the Debtors no later than the Exhibit Filing Date. A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Fourth Amended Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Liquidation Trustee within 30 days after the later of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim shall be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Confirmation Date. Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors, or their successors or its respective Properties.

PRESERVATION OF RIGHTS OF ACTION

The Liquidation Trustee shall retain, and in accordance with its determination of the best interest of the estate, may enforce any claims, rights and causes of action (i) arising under sections 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtors as of the Petition Date, or the Estate, and arising under any provision of state or federal law, or any theory of statutory or common law or equity. Unresolved Causes of Action shall be assigned to the Liquidation Trustee. The potential proceeds from these Unresolved Causes of Action (including but not limited to the adversary proceeding pending against Pensco) are uncertain and speculative and therefore, no value

has been assigned to such recoveries. The Liquidation Trustee reserves the right, to continue to prosecute the Unresolved Causes of Action, whether arising prior to or after the Petition Date.

The Court Appointed Liquidation Trustees shall be responsible post-confirmation for the pursuit of any Claims that exist to recover CFA Cash Collateral which was improperly used by the Debtors during the pendency of the Bankruptcy Case.

## NOTICES TO HOLDERS OF CLAIMS AND INTERESTS

This disclosure statement and is being furnished by the Proponent to the Debtors' known creditors and interest holders pursuant to section 1125(b) of the bankruptcy code. A copy of the Fourth Amended Plan is included in this package and is incorporated herein by reference.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE PROPONENT. THE STATEMENTS AND OPINIONS SET FORTH HEREIN ARE THOSE OF THE PROPONENT, AND NO OTHER PARTY HAS ANY RESPONSIBILITY WITH RESPECT THERETO.**

**THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY ANY BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

The historical information concerning the Debtors' has been prepared using the Debtors' Schedules and certain filings made with the Bankruptcy Court. The estimates of Claims and Interests set forth herein may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court. While every effort has been made to ensure the accuracy of all such information, except as noted in the Disclosure Statement, the information presented herein is unaudited and has not been examined, reviewed or compiled by the Proponent's independent public accountants. The ultimate extent of the Secured Claims against the Debtors' Properties will depend upon the valuation of the Debtors' Properties and the application of section 506 of the Bankruptcy Code.

This Disclosure Statement contains a summary of certain provisions of the Fourth Amended Plan and the transactions contemplated thereunder, as well as descriptions of certain other related documents. While the Proponent believes that these summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents. Reference is made to the Fourth Amended Plan and the documents referred to herein and therein for a complete statement of the terms and provisions thereof. In the event of any inconsistency between the terms of the Fourth Amended Plan and this Disclosure Statement, the terms of the Fourth Amended Plan shall be controlling. In reviewing the Fourth Amended Plan and this Disclosure Statement, the reader should give special attention to "RISK FACTORS." No statements or

information concerning the Debtors or their assets, results of their business operations or financial condition have been authorized by the Debtors and the information contained in this Disclosure Statement has been prepared solely from the Debtors records.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein. The delivery of this Disclosure Statement shall not create, under any circumstances, an implication that there has been no change in the facts set forth herein since the date hereof.

This Disclosure Statement is intended for the sole use of Creditors and Interest Holders to make an informed decision about the Fourth Amended Plan. Each holder of a Claim or Interest should review this Disclosure Statement and all exhibits hereto (including the Fourth Amended Plan) as well as the publicly filed documents which are available on the Bankruptcy Court website. Holders of Claims or Interests are urged to consult with their own legal and financial advisors.

No solicitation of votes to accept or reject the Fourth Amended Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No Person has been authorized to use or promulgate any information concerning the Debtors or its business or the Fourth Amended Plan, other than the information contained in this Disclosure Statement and the exhibits hereto. You should not rely on any information relating to the Debtors or its business or the Fourth Amended Plan other than that contained in this Disclosure Statement and the exhibits hereto.

## PROPONENT'S RECOMMENDATION

In the Proponent's opinion, the treatment of Creditors and Interest Holders under the Fourth Amended Plan provides a greater recovery than is likely to be achieved under any other alternatives, including liquidation under Chapter 7. See "ALTERNATIVES TO THE PLAN." In particular, the distribution to Unsecured Creditors in the case comes only from the agreement of Proponent to allow those Claims to be paid from assets that would otherwise be subject to CFA's lien. Absent this agreement, the Proponent believes that in a Chapter 7 liquidation, there would be no recovery for Unsecured Creditors, after payment of claims with priority over unsecured claims.

## THE PROPONENT BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS.

## POST-CONFIRMATION OPERATING REPORTS AND UNITED STATES TRUSTEE'S FEES

The Debtors shall be responsible for the preparation and filing of operating reports until such time that the Fourth Amended Plan is confirmed. The Liquidation Trustee shall be responsible for filing all post-confirmation operating reports and payment of all post-confirmation fees until entry of a final decree in this case. Quarterly fees payable to the Office of the United States Trustee shall be paid by the Debtors until the Confirmation of the Fourth Amended Plan. Quarterly post-confirmation fees shall be payable by the Liquidation Trustee. Post confirmation the Liquidating Trustee shall pay

a consolidated U.S. Trustee's Fees on behalf of all Debtors and rather than a single fee for each Debtor and also filed consolidated Operating Reports.

## TRANSFER TAXES

Pursuant to section 1146(a) of the Bankruptcy Code, the initial issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Fourth Amended Plan (including any instrument executed in furtherance of the transactions contemplated by the Fourth Amended Plan including but not limited to the sale of the Debtors' Properties to Proponent or a third party at the Public Auction Sale) shall be exempt and shall not be subject to tax under any law imposing a Transfer Tax, mortgage recording tax or similar tax (collectively, a "Property Sale Tax") as set forth in the Fourth Amended Plan.

Proponent believes that the sale of the Properties will fall under the exemptions from Property Sale Tax set forth in §1146(a) of the Bankruptcy Code, a discussion of such exemption is more fully set forth in the decision of the Supreme Court in <u>Florida Department of Revenue v. Piccadilly Cafeterias, Inc.</u>, 128 S.Ct. 2326 U.S., (2008), as the sale of the Properties is proposed to be made pursuant to a plan confirmed under §1129 of the Bankruptcy Code. However, in the event that Property Sale Tax is applicable to the sale of the Properties sold in accordance with this Fourth Amended Plan, it is understood that such Property Sale Tax is a liability of the Debtors' estate, and as such, in no event shall CFA's net distribution received under this Fourth Amended Plan (whether pursuant to CFA's Credit Bid, or pursuant to a higher and better offer subject to the Minimum Overbid requirements) be in an amount less than $10,000,000.00.

## REVOCATION OF THE FOURTH AMENDED PLAN

The Proponent may revoke or withdraw the Fourth Amended Plan at any time prior to entry of the Confirmation Order. If the Proponent revokes or withdraws the Fourth Amended Plan, or if no Confirmation Order is entered, the Fourth Amended Plan shall be null and void, and nothing contained in the Fourth Amended Plan shall constitute a waiver or release of any Claims by or against, or any Interest in, the Proponent; or prejudice in any manner the rights of the Proponent in any further proceedings involving the Proponent.

## RETENTION OF JURISDICTION

The Fourth Amended Plan contains detailed provisions providing for the retention of jurisdiction by the Bankruptcy Court over the Case for the purposes of, *inter alia,* determining all disputes relating to Claims or Interests and other issues presented by or arising under the interpretation, implementation or enforcement of the Fourth Amended Plan and the entry of an Order confirming that the sale of the Properties by the Liquidation Trustee has been consummated in compliance with the Fourth Amended Plan and the Bankruptcy Code, including, without limitation, §§ 363(m) and (f) thereof. See Article 13 of the Fourth Amended Plan for further detail regarding the Bankruptcy Court's Retained Jurisdiction.

# RISK FACTORS

The Fourth Amended Plan significantly restructures the Debtors' obligations to its Creditors. Although the Proponent believes that the Debtors will be able to meet all of the obligations that it is undertaking pursuant to the Fourth Amended Plan there can be no assurance that future events will not cause the Debtors to default on one or more of its obligations under the Fourth Amended Plan. Each Creditor, Interest Holder and their respective advisers should consider the following factors (and other risks considered elsewhere in this Disclosure Statement).

All distributions to Creditors are contingent on the Fourth Amended Plan being confirmed by this Court. Parties in interest need to evaluate these possibilities in connection with their determination to vote to accept or reject the Fourth Amended Plan.

# VOTING INSTRUCTIONS

## WHO MAY VOTE – IN GENERAL

As noted herein, Claims in Class 2 are not impaired by the Fourth Amended Plan. Accordingly, holders of claims in Class 2 is not entitled to vote and are deemed to have accepted the Fourth Amended Plan.

Claims in Classes 1 and 3 are impaired by the Fourth Amended Plan, and as such, Classes 1 and 3 are entitled to vote.

Claims in Class 4 receive nothing under the Fourth Amended Plan, and as such, Class 4 is not entitled to vote and is deemed to have rejected the Fourth Amended Plan.

# CONFIRMATION OF THE PLAN

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Fourth Amended Plan, on _____ at _____ a.m, Eastern Standard Time, in the United States Bankruptcy Court, One Bowling Green, New York, New York. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Fourth Amended Plan be filed and served on or before _____ 2009 at 4:00 p.m. EST.

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Fourth Amended Plan. **The Confirmation Hearing is scheduled to commence on _____ 2009, at 10:00 a.m. in the United States Bankruptcy Court, United States Bankruptcy Court, One Bowling Green, New York, NY 10004-1408.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

The Bankruptcy Court has directed **that objections, if any, to confirmation of the Fourth Amended Plan be filed and served on or before _____, 2009**. Objections must be served upon (i) Kriss & Feuerstein LLP, 360 Lexington Avenue, Suite 1200, New York, New York, 10017, Attn: Jerold C. Feuerstein, Carl Person, Esq. 325 West 45th Street, Suite 201, New York, New York 10036 and Elisabetta Gasparini, Office of the United States Trustee, 33 Whitehall Street, 21St Floor, New York, NY 10004 and filed electronically in accordance with the Court's ECF procedures.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Fourth Amended Plan. The Proponent intends to seek Confirmation of the Fourth Amended Plan at the Confirmation Hearing. **The Proponent believes that the Fourth Amended Plan satisfies all applicable requirements of section 1129(a) and section 1129(b) of the Bankruptcy Code**. Confirmation makes the Fourth Amended Plan binding upon the Proponent, its Interest Holders, all Creditors and other parties regardless of whether they have accepted the Fourth Amended Plan.

With the entry of the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise provided in the Fourth Amended Plan, the distributions provided for in the Fourth Amended Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims against or Interests in the Debtors or any of its assets or properties, including any Claim or Interest accruing after the Petition Date and before the Confirmation Date. As of the Effective Date, all holders of Claims or Interests will be precluded from asserting any Claim against the Debtors or its assets or properties or other interests in the Debtors based on any transaction or other activity of any kind that occurred before the Confirmation Date except as otherwise provided in the Fourth Amended Plan.

## REQUIREMENTS FOR CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Fourth Amended Plan. These requirements include determinations by the Bankruptcy Court that: (i) the Fourth Amended Plan has classified Claims and Interests in a permissible manner, (ii) the contents of the Fourth Amended Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Fourth Amended Plan has been proposed in good faith, (iv) the disclosures concerning the Fourth Amended Plan that are adequate and include information concerning all payments made or promised in connection with the Fourth Amended Plan

and the Case, (v) the Fourth Amended Plan is in the "best interests" of all Creditors and Interest Holders, (vi) the Fourth Amended Plan is feasible, and (vii) the Fourth Amended Plan has been accepted by the requisite number and amount of Creditors or Interest Holders in each Class entitled to vote on the Fourth Amended Plan, or that the Fourth Amended Plan may be confirmed without such acceptances. The Proponent believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Liquidation Analysis.** Another confirmation requirement is the so-called "best-interests" test. The "best-interest" test requires that each impaired Creditor and impaired Interest Holder either (a) accepts the Fourth Amended Plan or (b) receives or retains under the Fourth Amended Plan property of a value, as of the Effective Date of the Fourth Amended Plan, that is not less than the value such entity would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders in each Class of Claims or Interest would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in a chapter 7 liquidation case. The amount that would be available for satisfaction of Allowed Claims against and Allowed Interests in the Debtors would consist of the proceeds resulting from the disposition of the Debtor's assets, augmented by the cash held by the Debtors at the commencement of the chapter 7 case. Such amount would be reduced by the amount of any Claim or Claims secured by the Debtors' assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the termination of the Debtors' business. Such value is then juxtaposed against the amount creditors are receiving under the Fourth Amended Plan to determine if the value each impaired creditor is receiving is the same or more than such creditor would receive from a chapter 7 liquidation on the Confirmation Date.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation. Such costs would include the fees payable to a chapter 7 trustee, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such Debtors may engage to assist in the liquidation. In addition, chapter 7 costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation. Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts entered into by the Debtor during the pendency of the Case in chapter 11.

After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time this Case was pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtors or any official committee appointed pursuant to section 1102 of the Bankruptcy Code.

After consideration of the effects that a chapter 7 liquidation would have on the proceeds available for distribution including (i) the increased costs and expenses of a chapter 7 liquidation

arising from fees payable to the Debtors in bankruptcy and professional advisors to such Debtors, (ii) the erosion in value of the Debtors' assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (iii) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of Unsecured Creditors and (iv) the dollar value of secured claims in this case which, the Proponent believes, exceeds the value of the Properties, the Proponent believes that holders of Unsecured Claims and Interest Holders would be unlikely to receive any distribution on account of their Claims and Interests.

The Proponent has concluded that the Fourth Amended Plan provides to each Creditor and -Interest Holder a recovery with a *present value* at least equal to the present value of the distribution that such person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Fourth Amended Plan pays holders of Unsecured Claims from the CFA Cash Collateral. In a liquidation scenario, holders of Unsecured Claims are unlikely to receive any distribution given the value of the Properties and the amount of the CFA Secured Claim. The Proponent further believes that the net effect of a conversion of this case to chapter 7 would be to (i) increase the administrative expenses of the estate and (ii) decrease the funds available for non-administrative creditors.

Accordingly, the Proponent believes that the Fourth Amended Plan provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation. A liquidation analysis detailing the amounts of the various claims is attached to this Disclosure Statement as **Exhibit C**.

**Feasibility.** For the Fourth Amended Plan to be confirmed, it must be demonstrated that consummation of the Fourth Amended Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation is set forth in the Fourth Amended Plan. This Fourth Amended Plan calls for the liquidation of the Debtors through the sale of all of its property. Thus, the Fourth Amended Plan meets the feasibility requirements of the Bankruptcy Code.

**Confirmation With the Acceptance of Each Impaired Class.** The Fourth Amended Plan may be Confirmed if each impaired Class of Claims or Interests accepts the Fourth Amended Plan. Classes of Claims or Interests which are not impaired are deemed to have accepted the Fourth Amended Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

Holders of Claims or Interests impaired by the Fourth Amended Plan are entitled to file Ballots accepting or rejecting the Fourth Amended Plan. Holders of Claims or Interests not impaired by the Fourth Amended Plan, are deemed to accept the Fourth Amended Plan, and may not vote to accept or reject the Fourth Amended Plan. Since holders of Interests will not receive nor retain any property under the Fourth Amended Plan and holders of Interests are deemed to reject the Fourth Amended Plan.

The Bankruptcy Code defines acceptance of a plan by a Class of Claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of Claims of that Class. Only those Claims, the holders of which actually vote to accept or reject the Fourth Amended Plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

**Confirmation Without the Acceptance of Each Impaired Class.** In the event that any impaired Class of Claims or Interests does not accept the Fourth Amended Plan, the Bankruptcy Court may nevertheless confirm the Fourth Amended Plan at the Proponents' request if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Fourth Amended Plan without regard to any vote cast on account of a Claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Fourth Amended Plan, the Bankruptcy Court determines that the Fourth Amended Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. The Proponent believes that the Fourth Amended Plan is in the best interest of all Creditors and Interest holders.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its Claims or Interests. The Proponent believes that under the Fourth Amended Plan all classes of Impaired Claims and Impaired Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Interests with which their legal rights are intertwined, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Interests in such class. Accordingly, the Proponent believes the Fourth Amended Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

Whether the Fourth Amended Plan is fair and equitable depends upon the application of the so-called "absolute priority rule." Subject to certain exceptions, this rule, codified in section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired Class of Claims or Interests that has not accepted the Fourth Amended Plan must be paid in full if a more junior class receives any distribution under the Fourth Amended Plan. As the Fourth Amended Plan provides for payment in accordance with the absolute priority rule in that no classes junior to impaired unsecured creditors receive any distribution, the plan complies with Section 1129(b)(2) of the Bankruptcy Code.

# EFFECT OF CONFIRMATION

INJUNCTION

Except (i) as otherwise provided in the Third Amended Plan or (ii) in any Final Order entered by the Bankruptcy Court, all persons who have held, hold, or may hold claims against, or interests in, the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from the commencement or continuation of any action, the employment of process, from taking any act to collect, enforce, attach, recover or offset against such claim and taking any act to create, perfect or enforce any lien or encumbrance against property of the estate which is to be transferred to the Purchaser or distributed to creditors under this Third Amended Plan.

**Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the parties released, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the released parties for any liability whatsoever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government o any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority against the released parties.**

LIMITATION OF LIABILITY

**Section 1125(e) of the Bankruptcy Code, commonly referred to as the "safe harbor," protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan. Pursuant to section 1125(e), as set forth in Article 11 of the Plan, neither the Proponent, nor its respective officers, directors, members, general partner, managers or employees (acting in such capacity), nor any professional person employed by any of them shall be liable on account of the solicitation or participation of the Fourth Amended Plan for violation for any applicable law, rule or regulation governing solicitations of acceptance or rejections of a plan except for (i) willful misconduct and gross negligence.**

**The Debtors and their respective officers, directors, members, general partner, managers or employees (acting in such capacity) are not entitled to a discharge because (a) the Fourth Amended Plan is a liquidating Plan (b) the Debtors will not be engaging in business**

**after the consummation of the Fourth Amended Plan, and (c) the Debtors would not be entitled to a discharge under 11 U.S.C. 727(a).**

## ALTERNATIVES TO THE FOURTH AMENDED PLAN

If the Fourth Amended Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code or (b) an order granting relief from stay for Proponent to pursue its state court remedies or (c) the promulgation and confirmation of an alternative plan of reorganization.

The Proponent believes that the Fourth Amended Plan provides a recovery to all Creditors and Interest Holders equal to or greater than would be obtainable in chapter 7 liquidation.

If the Fourth Amended Plan is not confirmed, the Debtor could attempt to formulate a different plan of reorganization. Such a plan might involve both a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The Proponent believes that the Fourth Amended Plan enables Creditors and Interest Holders to realize the most value under the circumstances at the present time. The Proponent reserves its right to file any Fourth Amended Plan and/or disclosure statement.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary of certain U.S. Federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Unsecured Claim. Each holder of an Allowed Unsecured Claim is urged to consult his own tax advisors. This summary does not cover all potential U.S. federal income tax consequences that could possible arise under the Fourth Amended Plan and does not address the Fourth Amended Plan's U.S. federal income tax consequences for any holder of an Unsecured Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect. Holders of Allowed Unsecured Claims should consult their own tax advisors as to the Fourth Amended Plan's specific federal, state, local and foreign income and other tax consequences.

In accordance with the Fourth Amended Plan, each holder of an Allowed Unsecured Claim (a "Holder") shall be entitled to his, her or its *pro-rata* share of the Available Cash. Each Holder will recognize gain or loss upon the receipt of such pro-rata share equal to the difference, if any, between the "amount realized" by such Holder and the Holder's adjusted basis in his, her or its Allowed Unsecured Claim. The "amount realized" is equal to the value of such Holder's pro-rata share of the Available Cash. Any gain or loss realized by a Holder should constitute ordinary income or loss to

her unless the Unsecured Claim is a capital asset. If an Unsecured Claim is a capital asset, and it has been held for more than one year, such Holder will realize long term capital gain or loss.

The tax consequences to Holders will differ and will depend on factors specific to each Holder, including but not limited to: (i) whether the Holder's Unsecured Claim (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Holder's Claim; (iii) the type of consideration received by the Holder in exchange for the Unsecured Claim; (iv) whether the Holder is a United States person or foreign person for tax purposes; (v)whether the Holder reports income on the accrual or cash basis method; (vi)whether the Holder has taken a bad debt deduction or otherwise recognized loss with respect to an Unsecured Claim.

**THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH HOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE IT IS IMPORTANT THAT EACH HOLDER OBTAIN HIS, HER OR ITS OWN TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER AS A RESULT OF THE PLAN.**

**THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON A TAX PAYER. THE DIUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH HOLDER SHOULD SEEK ADVICE BASED UPON THE HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## MISCELLANEOUS

A.    **Reliance.** The Liquidation Trustee, its agents, employees and professionals, while acting in their capacity as such, including but not limited to, objecting to Claims, making Distributions to Creditors holding Allowed Claims and litigating and approving settlement of Causes of Action, as the case may be, shall be permitted to reasonably rely on any certificates, sworn statements, instruments, reports, claim dockets, schedules, or other documents reasonably believed by it to be genuine and to have been prepared or presented by the Bankruptcy Court Clerk's Office, the Debtor, and the Debtor's Professionals.

B.    **Good Faith.** Confirmation of the Fourth Amended Plan will constitute a finding that the Fourth Amended Plan has been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code.

C.    **Fees.** Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to Final Decree. It is understood that the U.S. Trustee shall be paid one (1) fee for the consolidated Estate of Debtors.

**D.    Fourth Amended Disclosure Statement.** This Fourth Amended Disclosure Statement amends and fully supersedes that certain Disclosure Statement for Consolidated Plan of Liquidation of Debtors as Proposed by CFA W. 111 Street, L.L.C., filed with this court by Proponent on August 14, 2009, the First Amended Disclosure Statement filed on August 31, 2009 and the Second Amended Disclosure Statement filed on September 14, 2009.

**E.    Substantial Consummation.** Substantial Consummation of the Plan shall be deemed to occur upon the Effective Date, which is the date upon which the Properties and such other assets of the Debtors' Estate are transferred to the Liquidation Trustee as provided for in this Fourth Amended Plan.

## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Fourth Amended Plan should be directed to (i) the Proponent's counsel, Kriss & Feuerstein LLP, 360 Lexington Avenue, Suite 1200, New York, New York 10017, Attn.: Jerold C. Feuerstein, (212) 661-2900 or (ii) may be retrieved from the Court's web site at https://ecf.nysb.uscourts.gov/cgi-bin/login.pl (provided such party has PACER access) by searching case no 09-10402 (SMB).

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in these cases are on file in the Office of the Clerk of the United States Bankruptcy Court, 1 Bowling Green, New York, New York, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 5:00 p.m.

## CONCLUSION

The Proponent believes that confirmation of the Fourth Amended Plan is in the best interests of all Creditors and Interest Holders and therefore should be accepted by all impaired classes of creditors and confirmed by the Court.

**Dated:** New York, New York
October 1, 2009

**CFA W. 111 Street, L.L.C.**

By: /s/ JOEL FOGEL
    **Joel Fogel,**
    **Officer of CFA W. 111 Street, L.L.C.**

**KRISS & FEUERSTEIN LLP**
**Attorneys for Proponent**
360 Lexington Avenue, Suite 1200
New York, New York 10017
(212) 661-2900

By: /s/ JEROLD C. FEUERSTEIN
    **Jerold. C. Feuerstein**
